**Lavern K. BROOKS, Appellant,**

v.

**Leora M. BROOKS, Appellee.**

**No. S–1107.**

Supreme Court of Alaska.

March 6, 1987.

Rehearing Denied April 14, 1987.

Sharon L. Gleason, John Reese, Reese, Rice and Voland, Anchorage, for appellant.

William T. Ford, Anchorage, for appellee.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

BURKE, Justice.

Lavern Brooks (Vern) appeals the trial court's property division order which distributed the marital assets of Leora and Vern Brooks in accordance with a prenuptial agreement entered into by the parties prior to their marriage. Vern contends that the trial court erred in four respects: first, in its determination as to the marital property available for distribution; second, in its valuation of certain items of marital property; third, in its overall division of the parties' property; and fourth, by failing to award Vern fees and costs. We affirm in part and reverse in part.

## I. FACTS AND PROCEEDINGS

Leora and Vern Brooks were married on August 5, 1978. It was each party's third marriage. At the time of their divorce, the Brooks had been married approximately 5½ years. Leora was 57 and Vern 54. The Brooks had no children together, but each has adult children from prior marriages.

At the time of their divorce, Leora was a resource management officer with the state of Alaska, earning approximately $24,000 per year. She is also a licensed real estate agent and has training in a number of other skills. Vern was an engineer with the FAA for 22 years and worked shortly for the Coast Guard in Juneau. He is currently retired on a medical disability, receiving $1,077 per month in disability benefits.

On July 31, 1978, five days before their marriage, the Brooks executed a prenuptial (or premarital) agreement. It provides in pertinent part:

WHEREAS, each of the parties own property in their respective sole and separate rights, which property they and each of them have acquired prior to said marriage, and it is the desire of the parties that said separate property shall retain its status free and clear of any claims by either party or their heirs against the property of the other;

NOW, THEREFORE, in consideration of the conditions and stipulations herein contained, LAVERN K. BROOKS, husband, and LEORA M. REID, wife, agree that during their marriage each of them shall be completely independent of the other as to all property owned by either of them before said marriage, and shall be subject to his or her disposition as his or her separate property in the same manner as if said proposed marriage had never been celebrated. Any and all property or monies acquired after said marriage shall be considered the joint property of husband and wife and in the event of termination of said marriage shall be divided equally.

This agreement was copied from a similar agreement Vern had made with his second wife. The original agreement was drafted by a lawyer in Juneau in January of 1970. No lawyers were consulted, however, in the preparation and signing of the agreement between the Brooks. The agreement was simply retyped by Leora from the old agreement and signed by both parties. The agreement does not enumerate the parties' premarital assets and neither party fully disclosed their respective assets.

The trial court granted the Brooks a divorce on January 25, 1984, retaining jurisdiction to make a division of property. On June 25, 1985, the court issued a formal property division order. In that order the trial court held that the parties "[pre]nuptial agreement was validly entered into" and would be "enforced in its entirety." Under this agreement, each party was to keep their own premarital assets, and the marital assets were to be divided equally. The order divided the assets and property of the Brooks as follows:

1. Premarital Assets

Leora

| | | |
|---|---|---|
| 1. | Cash brought to marriage | $ 80,000 |
| 2. | Townhouse (bought with premarital funds) | NVG* |

Lavern

| | | |
|---|---|---|
| 1. | Equity in Apartment Complex | $268,117 |
| 2. | Gift from mother | $100,000 |
| 3. | Kent Street residence | NVG |

| | | |
|---|---|---|
| 4. | Stocks, bonds, Juneau escrow | NVG |

2. Marital Assets

Leora

| | | |
|---|---|---|
| 1. | One-half appreciation in apartment complex | $200,000 |
| 2. | One-half marital assets used for gifts to Vern's sons | $ 60,000 |
| 3. | 45th Avenue four-plex | $ 50,000 |
| 4. | Prepaid tax credit | $ 12,113 |
| 5. | Cash | $ 87,500 |
| 6. | Jewelry; other personal property in her possession | NVG |
| 7. | State retirement benefits | NVG |
| 8. | Interest in upholstery partnership (The Golden Needle) | NVG |
| 9. | Vehicles in her possession | NVG |
| 10. | Undivided one-half interest in mobile home park[1] | NVG |
| 11. | Bank note with interest secured by deeds on mobile home park, payable upon sale of the park | $155,416 |

Lavern

| | | |
|---|---|---|
| 1. | One-half appreciation in apartment complex | $200,000 |
| 2. | Cash | $ 37,500 |
| 3. | Undivided one-half interest in mobile home park | NVG |
| 4. | Jewelry; other personal property in his possession | NVG |
| 5. | Vehicles in his possession | NVG |

*NVG = no value given.

With respect to the mobile home park, the trial court held that it could either be sold and the proceeds divided equally or that Vern could "buy out" Leora for $649,-000 in cash or upon terms agreeable to her. Leora was empowered to sell the park at any price that would produce a net gain of $820,659. The four mobile homes owned by the parties were to be sold as an asset of the park. The trial court also ordered each party to bear his or her own costs and attorney's fees except that the appraisal and witness fees of Leora's appraiser were to be paid by the marital estate. A final decree of divorce incorporating this property division was subsequently entered. This appeal followed.

Later, in December 1985, the trial court heard on shortened time a motion by Leora to accept her valuation of the four mobile homes of the parties at $70,000 and reduce her interest in them to a $35,000 cash judgment while awarding Vern the mobile

---

1. The park was valued at $1,786,000 with a net equity of $1,297,583.

homes.[2] The court entered judgment over Vern's objection. This issue was raised in supplemental points on appeal.

## II. DISCUSSION

### A. *The Validity of Prenuptial Agreements Made in Contemplation of Divorce*

The division of property upon divorce is generally done pursuant to AS 25.24.-160(4).[3] In this case, however, the trial court divided the Brooks' property in accordance with the prenuptial agreement the parties signed shortly before their marriage. We have yet to pass upon the validity of prenuptial agreements in this state. Thus, even though neither party challenges the agreement here, we must address this threshold issue.

**2.** Sometime between March and December 1985, Leora sold the trailer park for $1.7 million. The buyer, however, did not want the four mobile homes.

**3.** AS 25.24.160(4) provides in pertinent part:

> In a judgment in an action for divorce or action declaring a marriage void or at any time after judgment, the court may provide
> ....
> (4) for the division between the parties of their property, whether joint or separate, acquired only during coverture, in the manner as may be just, and without regard to which of the parties is in fault; however, the court, in making the division, may invade the property of either spouse acquired before marriage when the balancing of the equities between the parties requires it; and to accomplish this end the judgment may require that one or both of the parties assign, deliver, or convey any of their real or personal property to the other party.

The division of property under this statute involves a three step process. The court must (1) determine what property is available for distribution, (2) value that property, and (3) determine the most equitable allocations. *Wanberg v. Wanberg,* 664 P.2d 568, 570 (Alaska 1983). The appropriate property division is within the broad discretion of the trial court and will not be disturbed unless clearly unjust. *Id.*

**4.** Prenuptial agreements in contemplation of divorce must be distinguished from prenuptial agreements in contemplation of death. While the former, until recently, were held to be presumptively invalid, the latter, since the time of Shakespeare,* have been considered presumptively valid because they were seen as conducive

The traditional common law view was that prenuptial agreements in contemplation of divorce[4] (hereinafter prenuptial agreements) were inconsistent with the sanctity of marriage and the state's interest in preserving marriage and maintaining the financial security of divorced persons. *E.g. Scherer v. Scherer,* 249 Ga. 635, 292 S.E.2d 662, 664 (1982); *see generally* Note, *For Better or for Worse ... But Just in Case, Are Antenuptial Agreements Enforceable?,* U.Ill.L.Rev. 531, 534 (1982). Courts uniformly viewed these agreements as inherently conducive to divorce[5] and as allowing a husband to circumvent his legal duty to support his wife. Thus, prior to 1970, prenuptial agreements that stipulated terms regarding alimony and property settlements upon divorce were almost universally considered void *ab initio* as contrary

to marital tranquility and preventing unnecessary litigation. *See Burtoff v. Burtoff,* 418 A.2d 1085, 1088 (D.C.App.1980); *Gant v. Gant,* 329 S.E.2d 106, 112 (W.Va.1985); *see generally* J. McCahey, *Valuation and Distribution of Marital Property,* § 4.01[2] (1985) (hereinafter McCahey).

> * And, for that dowry, I'll assure her of her Widowhood, be it that she survive me, In all my land and leases whatsoever. Let specialties be therefore drawn between us, That covenants may be kept on either hand.

W. Shakespeare, *Taming of the Shrew,* Act 2, Scene 1.

**5.** The time-honored majority rule in this country has been that contracts intended to facilitate or promote the procurement of a divorce are illegal as contrary to public policy. Restatement (Second) of Contracts § 190 (1979). The reason prenuptial agreements were thought to promote divorce was stated in *Crouch v. Crouch,* 53 Tenn.App. 594, 385 S.W.2d 288, 293 (1964):

> [S]uch [a] contract is promotive of divorce and void on grounds of public policy. Such contract[s] could induce a mercenary husband to inflict on his wife any wrong he might desire with the knowledge that his pecuniary liability would be limited. In other words, a husband could through abuse and ill treatment of his wife force her to bring an action for divorce and thereby buy a divorce for a sum far less than he would otherwise have to pay.

*See also Fricke v. Fricke,* 257 Wis. 124, 42 N.W.2d 500 (1950) (such agreements invite dispute, encourage separation and incite divorce).

to public policy.[6] *E.g. Marschall v. Marschall*, 195 N.J.Super. 16, 477 A.2d 833, 836 (1984); *see also* 2 Lindey, *Separation Agreements and Antenuptial Contracts*, § 90 at 90–93 (1983).

Since 1970,[7] however, public policy has changed markedly.[8] Freed & Walker, *Family Law in the Fifty States: An Overview*, 19 Fam.Law Q. 331, 438 (1985–86) (hereinafter *"Overview"*). With the advent of no-fault divorce laws[9] and the changes in society such laws represent, the traditional rule has rapidly given way to the more realistic view that prenuptial agreements are not void *ab initio* but are valid and enforceable if certain standards of "fairness" are met. *Id.* Although the standards vary from state to state, the following three criteria are typically considered:

1. Was the agreement obtained through fraud, duress or mistake, or misrepresentation or nondisclosure of material fact?

2. Was the agreement unconscionable when executed?

3. Have the facts and circumstances changed since the agreement was executed, so as to make its enforcement unfair and unreasonable?

*Scherer*, 292 S.E.2d at 666 (citations omitted). If none of the above factors are present, prenuptial agreements have generally been accorded judicial recognition. *E.g. Id.*[10]

The modern thinking on prenuptial agreements is reflected in the Uniform Premarital Agreement Act (UPAA).[11] Under the UPAA, prenuptial agreements in writing and signed by both parties are presumed valid. UPAA § 6, 9A U.L.A. at 383–84. This presumption can be rebutted, however, if the party seeking invalidation of the prenuptial agreement proves that:

(1) that party did not execute the agreement voluntarily; or

(2) the agreement was unconscionable when it was executed and, before execution of the agreement, that party:

(i) was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;

(ii) did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and

[T]oday 58.7 percent of all married women are gainfully employed.... [W]e no longer have a society-wide consensus on the sanctity of marriage: ... as of 1983 there were 114 divorced persons per 1,000 married persons.... Currently divorces are being granted ... at the rate of approximately 1,200,000 per year.

*Gant*, 329 S.E.2d at 112 (citations and footnotes omitted).

---

6. The policy grounds most frequently cited by the courts were that prenuptial agreements (1) are incompatible with and denigrate the marital relation; (2) tend to facilitate and induce divorce; and (3) burden the state by casting indigent spouses on public charity. *Ferry v. Ferry*, 586 S.W.2d 782, 785 (Mo.App.1979).

7. The case generally considered to mark the judicial watershed on prenuptial agreements is *Posner v. Posner*, 233 So.2d 381 (Fla.1970), *rev'd on other grounds*, 257 So.2d 530 (Fla.1972) (prenuptial agreement invalidated on grounds of nondisclosure).

8. As the West Virginia Supreme Court recently noted:

The older rule was grounded in yesteryear's sound public policy: in general, thirty years ago women did not work in the market economy; society enjoyed a consensus that favored lifetime marriage and disfavored divorce; and prenuptial agreements that limited the support obligation in favor of former wives encouraged divorce and made divorced women potential charges of the state.

Circumstances have changed dramatically in the last three decades, however....

9. All American jurisdictions now have some form of "no-fault" divorce. *Overview, supra*, at 341. In Alaska, a divorce or a dissolution may be obtained on the "no-fault" grounds of "incompatibility of temperament." *See* AS 25.24.-050(5)(C) (divorce), and AS 25.24.200(b)(1) (dissolution).

10. See also cases cited *infra* note 16.

11. The UPAA was approved by the National Conference of Commissioners on Uniform State Laws in 1983. To date, it has been adopted in three states; California, North Dakota, and Virginia.

(iii) did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.

*Id.* § 6(a), 9 U.L.A. at 383–84.[12]

As the authorities above atest, the idea that prenuptial agreements induce divorce is anachronistic. Today, divorce is a "common-place fact of life."[13] *Posner*, 233 So.2d at 384. As a result there is a concurrent increase in second and third marriages—often of mature people with substantial means and separate families from earlier marriages. The conflicts that naturally inhere in such relationships make the litigation that follows even more uncertain, unpleasant and costly. Consequently, people with previous "bad luck" with domestic life may not be willing to risk marriage again without the ability to safeguard their financial interests. In other words, without the ability to order their own affairs as they wish, many people may simply forgo marriage for more "informal" relationships.[14]

Prenuptial agreements, on the other hand, provide such people with the opportunity to ensure predictability, plan their future with more security, and, most importantly, decide their own destiny.[15] Moreover, allowing couples to think through the financial aspects of their marriage beforehand can only foster strength and permanency in that relationship. In this day and age, judicial recognition of prenuptial agreements most likely "encourages rather than discourages marriage." *Gant*, 329 S.E.2d at 112–13.

■■ In sum, both the realities of our society and policy reasons favor judicial recognition of prenuptial agreements. Rather than inducing divorce, such agreements simply acknowledge its ordinariness. With divorce as likely an outcome of marriage as permanence, we see no logical or compelling reason why public policy should not allow two mature adults to handle their own financial affairs. Therefore, we join those courts[16] that have recognized that prenuptial agreements legally procured and ostensibly fair in result are valid and can

---

**12.** Section 6 of the UPAA further provides:

(b) If a provision of a premarital agreement modifies or eliminates spousal support and that modification or elimination causes one party to the agreement to be eligible for support under a program of public assistance at the time of separation or marital dissolution, a court, notwithstanding the terms of the agreement, may require the other party to provide support to the extent necessary to avoid that eligibility.

(c) An issue of unconscionability of a premarital agreement shall be decided by the court as a matter of law.

**13.** "This society's staggering divorce rate can only place any reasonable person on notice that divorce is as likely an outcome of any marriage as a permanent relationship." *Gant*, 329 S.E.2d at 113.

**14.** Few impediments—economic or social—now exist to establishing joint households without the benefit of formal marriage. In fact, nationwide figures show that at the last census there were nearly two million (1,988,000) "cohabitating" unmarried couples of the opposite sex in America. U.S. Bureau of the Census, Statistical Abstract of the United States; 1985 (105 Edition) Washington D.C. 1984 at 40.

**15.** Although courts have a high regard for their own wisdom, not everyone has unreserved enthusiasm for the fact that upon divorce his or her assets, property and even future income are subject to division entirely within the broad discretion of the trial court.

**16.** Cases recognizing the validity of prenuptial agreements include: *Dingledine v. Dingledine*, 258 Ark. 204, 523 S.W.2d 189 (1975); *In re Marriage of Dawley*, 17 Cal.3d 342, 131 Cal.Rptr. 3, 551 P.2d 323 (1976); *Newman v. Newman*, 653 P.2d 728 (Colo.1982); *Parniawski v. Parniawski*, 33 Conn.Sup. 44, 359 A.2d 719 (1976); *Posner*, 233 So.2d at 386; *Scherer*, 292 S.E.2d at 666; *Rossiter v. Rossiter*, 4 Hawaii App. 333, 666 P.2d 617 (1983); *Volid v. Volid*, 6 Ill.App.3d 386, 286 N.E.2d 42 (1972); *Matlock v. Matlock*, 223 Kan. 679, 576 P.2d 629 (1978); *Osborne v. Osborne*, 384 Mass. 591, 428 N.E.2d 810 (1981); *Frey v. Frey*, 298 Md. 552, 471 A.2d 705 (1984); *Rudbeck v. Rudbeck*, 365 N.W.2d 330 (Minn. App.1985); *Ferry*, 586 S.W.2d at 787–88; *D'Onofrio v. D'Onofrio*, 200 N.J.Super. 361, 491 A.2d 752 (1985); *Marschall*, 477 A.2d at 838–40; *Hook v. Hook*, 69 Ohio St.2d 234, 431 N.E.2d 667 (1982); *Freeman v. Freeman*, 565 P.2d 365 (Okla.1977); *Unander v. Unander*, 265 Or. 102, 506 P.2d 719 (1973); *Gant*, 329 S.E.2d at 114–16; *In re Marriage of Hadley*, 88 Wash.2d 649, 565 P.2d 790 (1977); *Button v. Button*, 126 Wis.2d 521, 378 N.W.2d 294 (1985).

be enforced.[17] "The reasoning that once found them contrary to public policy has no place in today's matrimonial law." *Marschall*, 477 A.2d at 839.

Turning to the Brooks' prenuptial agreement, we hold that it is not void *ab initio* as against public policy. We express no opinion, however, regarding the enforceability of the Brooks' agreement under the above enunciated standards. The parties do not appeal this issue and we find no per se abuse of discretion in the trial court's ruling.

### B. *The Property Available for Distribution*

#### 1. *Leora's Premarital Assets*

The trial court held that each party was entitled to reimbursement for the separate property they brought into the marriage. It determined the premarital contributions of Leora apparently to be $80,000 in cash and an Anchorage townhouse (with an equity of $30,000) bought by Leora with premarital funds in 1981.

Vern argues that this finding is erroneous in several respects. First, he contends that Leora failed to establish the amount of separate property, if any, that she brought into the marriage. Alternatively, Vern asserts that the townhouse should have been considered marital property because it was purchased during the marriage and sustained with marital funds and that Leora was "double credited" by being awarded $80,000 in cash plus the townhouse.

Findings of fact made at trial may not be set aside on appeal unless they are clearly erroneous. Alaska R.Civ.P. 52(a).[18] A finding may not be set aside as clearly erroneous unless the reviewing court has a "definite and firm conviction that a mistake has been made." *Williams v. Alyeska Pipeline Service Co.*, 650 P.2d 343, 347 (Alaska 1982) (footnote omitted).

■ Our review of the record convinces us that the trial court's finding that Leora brought $80,000 worth of assets to the marriage was not clearly erroneous. Leora testified at trial that she had between $70,-000 and $80,000 at the time of her marriage to Vern. Although Vern presented conflicting testimony on this issue, it is not our job to reweigh the evidence. We merely determine whether the trial court's finding is supported by the record. In this case we find that it is.

■ Vern's argument that the townhouse should have been considered marital property is also unpersuasive. While the townhouse was purchased during the marriage,[19] it is undisputed that Leora used her own premarital funds to purchase it. In fact, Vern admitted at trial that the townhouse was "her property" and that he had "no monetary involvement whatsoever." Based on this evidence, the trial court's determination that the townhouse is Leora's separate property is not erroneous.

As to Vern's third argument, we are unable to discern from the trial court's order whether or not Leora was "double credited" with $80,000 in cash plus the $30,000 equity in the townhouse. The property division order is ambiguous and susceptible to different interpretations. On the one hand, it could be read to award Leora only $80,000 in premarital assets ($50,000 in cash and the townhouse), a finding supported by the record. On the other hand, it could also be interpreted as awarding Leora $110,000 in premarital assets (80,000 in cash and the townhouse), a finding that is clearly erroneous. Because of this ambiguity, we must remand this issue

17. *See* UPAA § 6, 9A U.L.A., at 383–84.

18. Civil Rule 52(a) provides in part:
 In all actions tried upon the facts without a jury ... the court shall find the facts specially and state separately its conclusions of law thereon.... Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the

trial court to judge of the credibility of the witnesses.

19. Leora purchased the townhouse when the Brooks first separated in 1981. She made the mortgage payments out of her salary when she lived there. When the parties reconciled in April of 1982, the townhouse was rented and paid its own way except when vacant.

to the trial court for clarification. On remand, the trial court is instructed to set out exactly what assets Leora brought to the marriage and credit her accordingly.

### 2. *Vern's Premarital Assets*

Vern contends that the trial court failed to credit him with over $125,000 in assets that he possessed at the time of the marriage and thus these funds were improperly made subject to equitable division. In particular, he claims that the court failed to award him $74,204 he had in various bank accounts and over $50,000 in retirement and sick leave benefits.

At trial Vern submitted an "accounting" of what his premarital assets were. This exhibit shows that he had $74,204.27 in various bank accounts. It was prepared by his accountant "almost entirely" from bank records and statements. It was admitted without objection and Leora did not challenge its validity. In fact, Leora's attorney admitted at trial that the "accounting" was an accurate reflection of Vern's premarital assets.[20]

 Despite this uncontested evidence, the trial court did not credit Vern with any of this money, nor did it explain its reasons for this omission. Leora attributes the court's failure to credit Vern with this money to the fact that it gave "little or no weight" to Vern's "accounting." This assertion is not supported by the record. The trial court made no credibility findings and there is absolutely no indication as to what weight it accorded this evidence. In the absence of any such credibility finding the only logical inference that can be drawn is that the trial court either arbitrarily ignored or simply overlooked the undisputed evidence. In either case, this finding is clearly erroneous.[21] On remand, the trial court is instructed to either fully set forth

its reasons why Vern is not entitled to this money or to credit him accordingly.

As to Vern's sick leave and retirement benefits, the trial court's ruling is correct. Vern's own "accounting" shows that he "cashed in" his sick leave in the first half of 1983 and his retirement benefits in 1982. Having already received this money prior to trial, the issue is now moot. Consequently, it was not error to refuse to credit Vern with these assets.

### 3. *The Equity in the International Apartments*

Vern purchased the International Apartments—a 32 unit complex in southwest Anchorage—in 1976, two years before he married Leora. At the time of the divorce, the complex was valued at $925,000 with an equity of $668,117. The trial court found that $400,000 of this equity constituted a marital asset and awarded Leora one-half of this, or $200,000.

Vern argues that it was error for the court to award Leora any of the equity in the apartment building for two reasons. First, he contends that the parties' prenuptial agreement prevents the invasion of this premarital asset. Second, he asserts that Leora's minimal contributions to, and work on, the apartments do not warrant invasion of the marital appreciation in the apartments under established principles of Alaska law. Alternatively, he claims that the trial court erroneously determined the amount of appreciation that occurred during the marriage.

The trial court held the Brooks' agreement valid and enforceable in its entirety. The agreement provides that "separate property shall retain its status free and clear of any claims by either party ... against the property of the other" and treated "as if said proposed marriage had

---

**20.** In closing argument, Leora's attorney stated: "When Mr. Brooks came into the marriage he had maybe pretty much what he said in his statement that [his accountant] prepared."

**21.** Leora's argument that because Vern failed to disclose these assets to her at the time of the marriage he should not be credited with them is

without merit. While nondisclosure is one of the factors many courts consider in determining if a prenuptial agreement is valid and enforceable, see *supra* pp. 1049–1050, Leora did not challenge the validity of the prenuptial agreement at trial nor does she challenge it here.

never been celebrated." It is undisputed that the apartment complex was Vern's premarital asset. Thus, under the terms of the Brooks' prenuptial agreement it seems clear that Vern should have received the entire equity in the apartments "free and clear of any claims" by Leora.

Leora argues, however, that the prenuptial agreement does permit invasion of the equity in the apartments because she is only willing "to allow the validity of the prenuptial agreement to the extent of allowing Mr. Brooks to *shield* that portion of assets which she knew to belong to him before the marriage." On a more realistic note, she also contends that her contributions to and work on the apartment complex justifies treating the post-marital appreciation of the premarital asset as marital property.

Leora's first argument is wholly without merit. Leora did not challenge the validity of the prenuptial agreement at trial. It is well established that matters not raised at trial will not be considered on appeal. *E.g.*, *Moran v. Holman*, 501 P.2d 769 (Alaska 1972). Thus, we decline to address this issue.

Leora is also not entitled to share in the appreciation of the apartment complex under the doctrine of equitable distribution. AS 25.24.160(4) authorizes a court to invade a spouse's premarital holdings "when the balancing of the equities between the parties requires it." We have interpreted this statute to allow the post-marital appreciation of a premarital asset to be treated as marital property only when necessary for a just and equitable property division. *Carlson v. Carlson*, 722 P.2d 222, 224 (Alaska 1986); *Burgess v. Burgess*, 710 P.2d 417, 420–21 (Alaska 1985); *Hunt v. Hunt*, 698 P.2d 1168, 1171–72 (Alaska 1985); *Wanberg v. Wanberg*, 664 P.2d 568, 570–71 (Alaska 1983); *Vanover v. Vanover*, 496 P.2d 644, 647 (Alaska 1972).

■ Our prior decisions do not hold, as the trial court apparently concluded, that post-marital appreciation of a premarital asset is per se a marital asset. Rather, they merely permit the trial court to invade the appreciation accumulated during the marriage where the equities so require. *Cf. Carlson*, 722 P.2d at 224; *Burgess*, 710 P.2d at 420–21; *Wanberg*, 664 P.2d at 571–72; *Vanover*, 496 P.2d at 647. While this distinction may appear highly technical, it is one of crucial importance. In short, it means that one spouse's separate property, including the post-marital appreciation, should not be deemed a marital asset available for division unless "the court specifically [finds] that a 'balancing of the equities between the parties require[s]' invasion of the premarital holding." *Carlson*, 722 P.2d at 224. Without such a finding, appreciation of a premarital asset cannot be subject to distribution.

■ In this case, the trial court made no specific finding that the "balancing of the equities" required invasion of the post-marital appreciation of the apartment complex. The failure to make such a finding could, in and of itself, require reversal of this issue. However, even assuming *arguendo* that the trial court had made such a finding, we are of the opinion that the equities in this case do not support division of the apartment's post-marital appreciation.

■ In the past, we have held that the "equities" support invasion of post-marital appreciation of premarital property under two general circumstances: first, where the parties demonstrate their intent to treat premarital property as joint property by both parties taking an active interest in the ongoing maintenance, management, and control of the asset(s), *Burgess*, 710 P.2d at 420; *Wanberg*, 664 P.2d at 571; and second, where one spouse's contribution to the marital community, pecuniary or otherwise, has benefited the other spouse's premarital property. *Vanover*, 496 P.2d at 648.

Neither of these circumstances exist here. There is no indication that the Brooks intended to hold the apartment complex jointly. In fact, the record reflects exactly the opposite intent. The record shows that Vern purchased the apartment complex over two years before

the Brooks' marriage and that throughout the marriage title to the property remained solely in his name. Vern also made all the mortgage payments and the Brooks never resided at the complex. The evidence further shows that the Brooks tried, as much as possible, to keep their respective assets and funds separate. Moreover, the parties' prenuptial agreement unambiguously denotes an intention to hold their prenuptial assets separately, "as if said ... marriage had never been celebrated."

While it is true that Leora did perform some limited maintenance and management tasks related to the apartment complex, the exact extent of these contributions is unclear from the record. However, even taking the evidence in the light most favorable to Leora, the tasks she performed on the apartment complex cannot be said to rise to the level of active interest in the ongoing maintenance, management and control of the property necessary to demonstrate an intent to hold the apartment complex jointly. *See Burgess,* 710 P.2d at 420–21 (intent to hold husband's separate property jointly found where wife contributed to mortgage payments, parties resided on property, and wife actively participated in its management and maintenance); *Wanberg,* 664 P.2d 572 (intent to hold husband's separate property jointly found where parties lived on the property, wife co-signed for sizable loan against property, and worked extensively in its maintenance and management). *Compare Carlson,* 722 P.2d at 224 (no intent to hold property jointly even though parties "commingled" assets where no joint management and control).

■■■ There is also no indication that Leora made any significant contribution to the "marital community" that inhered to the benefit of the apartment complex. Vern bought the complex for $300,000 in February of 1976. In August, 1985 it was appraised at $925,000. During the period of the Brooks' marriage, the record does not indicate that any major repairs or improvements were made to the property. Thus, the $625,000 appreciation in the apartment complex's value appears to have been passive rather than active.[22] In other words, the property's increased value was caused solely by inflation and/or other economic factors to which Leora in no way contributed.

We have never held that a non-titled spouse is entitled to share in the passive appreciation of separate property. Instead, implicit in our prior decisions is the recognition that in order to be entitled to share in the appreciation of premarital property, the non-titled spouse must have made affirmative contributions to the active appreciation of the property. *See Carlson,* 722 P.2d at 224; *Burgess,* 710 P.2d at 420–21; *Hunt,* 698 P.2d at 1171–72; *Wanberg,* 664 P.2d at 568; *Vanover,* 496 P.2d at 647–48; *see also, Ross v. Ross,* 496 P.2d 662 (Alaska 1972). This analysis is grounded in our belief that the division of the appreciated value of separate property should generally be a function of the tangible contributions of each spouse and not the mere existence of the marital relationship. Here, Leora made no tangible contributions that related to the increased value of the apartment complex. Consequently, she is not entitled to any portion of the marital appreciation.[23]

### 4. *Gifts to Vern's Children*

During the course of the Brooks' marriage a number of gifts were made to Vern's four sons totalling approximately $120,000. The trial court held that these gifts were "to be treated as a marital asset and allocated as though they were still part

---

**22.** Many courts have recognized two types of "causes" for the appreciation of separate property—passive and active. Passive appreciation is appreciation that occurs without any significant contribution being made toward that increase by either spouse (i.e. inflation or other economic factors beyond the spouse's control). *McCahey, supra* at § 18.06. Conversely, active appreciation is the result of some affirmative action taken by one or both spouses which caused the increased value of the separate property. *Id.*

**23.** Because this finding must be reversed and remanded for the reasons discussed above, we need not reach the third argument raised by Vern on this issue.

of the marital estate." Accordingly, Leora was awarded an additional $60,000 to credit her for one-half of the value of the gifts.

Vern argues that this ruling is incorrect as a matter of law. He contends that reimbursement of gifts to third parties is only required where the other spouse is defrauded by the transfer. The gifts to his sons, Vern asserts, did not defraud Leora but were gifts from both of them made with her knowledge, consent and participation.

Vern's contention on this issue raises a question of law, namely, whether the trial court applied the correct legal standard in determining that the gifts to Vern's sons were to be considered marital assets. The standard of review on such an issue is one of "independent judgment." *Wanberg*, 664 P.2d at 570; *Walsh v. Emerick*, 611 P.2d 28, 30 (Alaska 1980). Under this standard it is our duty "to adopt the rule of law that is most persuasive in light of precedent, reason and policy." *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

We have never fully addressed the issue of when a gift made by one spouse to a third party during the course of a marriage should be considered a marital asset.[24] Courts in other jurisdictions, however, have generally only required reimbursement when the other spouse is defrauded by the transfer. *E.g., Anderson v. Anderson*, 583 S.W.2d 504 (Ky.App.1979).

■ The most current thinking on this issue is reflected in the Uniform Marital Property Act (UMPA).[25] 9A U.L.A. 21 (1983). Section 6(a) of the UMPA provides that any gift to a third person out of mari-

tal property is valid when "both spouses act together in making the gift." *Id.* at 33. However, if both spouses do not join in making the gift, it is voidable at the option of the non-participating spouse. *Id.*

The UMPA approach to analyzing gifts made by one spouse during the marriage is persuasive. It supplies a logical, sound rule of easy application. It also accords ample protection against any surreptitious actions.

■ Applying this standard to the facts of this case, we are unable to determine whether the Brooks "acted together" in making these gifts. The record as a whole indicates that the gifts were not made in order to deprive Leora of a portion of the marital estate.[26] They were not secret, unilateral conveyances made without Leora's knowledge and consent. Rather, the record shows that Leora was aware of the circumstances of each gift and at no time objected to them.[27] However, we are unable to tell from the record whether Leora was aware that the gifts were being made out of marital property or if she only consented to presentation of the gifts because she believed Vern was making them out of his own separate assets. The distinction is crucial. On the one hand, if Leora consented to the gifts under the mistaken belief that Vern was using his own assets, then the gifts were not "jointly" made and thus are voidable. On the other hand, if Leora knew the gifts were being made out of marital assets and consented to them, the gifts were "jointly" made and thus valid.

On remand, the trial court is instructed to make specific findings on the nature of

**24.** In *Brooks v. Brooks*, 677 P.2d 1230, 1231, 1234 (Alaska 1984), we upheld the trial court's inclusion as a marital asset of two parcels of property that the husband had conveyed to his children without the knowledge or consent of his wife. However, in that case, the husband did not object to the trial court's treatment of the property as a marital asset and we laid down no guidelines or standards. *Id.* at 1234.

**25.** The UMPA was approved by the National Conference of Commissioners on Uniform State Laws in 1983. To date, it has been adopted in Wisconsin. 9A U.L.A. at 21.

**26.** The gifts were not made at or near the time of the divorce, nor did Vern retain any control over them.

**27.** The largest gift made ($70,000) was actually physically done by Leora. She withdrew the money from the bank and gave it to Vern's son herself. Leora, on one occasion, even discussed with Vern the possibility of placing a limitation on the amount of gifts to each son in order to prevent inequities.

Leora's knowledge and consent. If it finds that Leora consented to the gifts with full knowledge that they were being made out of marital property, then the gifts are to be held valid and Leora is not to be credited for one-half their value. If, however, the trial court finds that Leora consented to the gifts only because she believed they were being made out of Vern's separate assets, then the gifts are voidable at Leora's option and she is entitled to be reimbursed for one-half their value.

### C. The Value of Properties Subject to Distribution

#### 1. The Diamond Bracelet

The parties each had a number of items of jewelry and other personal property in their possession at the time of divorce upon which the trial court concluded there was "little or no evidence of value received." Accordingly, it simply awarded each party the jewelry and personal property in their possession. Vern asserts the court erred by refusing to value a diamond bracelet worth $20,000 awarded to Leora and credit it as part of the parties' marital assets. Leora answers that, due to the large number of items of personal property upon which no evidence of value was received, the court's treatment of this single item was not clearly in error.

■■■ A trial court's evaluation of marital property is a factual determination. Thus, it will not be set aside unless it is clearly erroneous. *Courtney v. Courtney*, 542 P.2d 164, 168 (Alaska 1975). Our review of the record convinces us that the trial court's failure to value the diamond bracelet was clearly erroneous. The uncontested evidence shows that Leora purchased the bracelet for $10,000 with marital funds shortly before she filed for divorce. At the time of trial Leora estimated the bracelet's value to be at least $20,000. Consequently, since the value of the bracelet was undisputed and it was bought with marital funds, the value of the bracelet should have been included in the value of the marital assets Leora received and Vern credited accordingly. On remand, the trial court is instructed to value the bracelet and include it as part of the marital estate subject to distribution.

#### 2. The Golden Needle

Leora was awarded her interest in the Golden Needle partnership—an upholstery business—without any value attached to it. In its oral findings the trial court stated, "I never heard a value as to the Golden Needle. I'm convinced that [Leora] has an interest in it, but there was no evidence of its present worth, and therefore, it would be purely speculative to assign any to it."

Vern argues that evidence presented at trial clearly shows that Leora was a one-half partner in the Golden Needle which had a value of at least $60,000. Thus, he contends, the court should have valued Leora's interest in the partnership at $30,000 and credited him accordingly. Alternatively, he asserts that he should have at least been credited with half the $8,000 promissory note Leora received from the partnership.

■■■ The evidence presented on this issue is voluminous, convoluted and confusing. However, it is undeniable that Leora's interest in the partnership had some value and evidence to that effect was presented at trial. While the state of the evidence may have made it difficult to determine what value to attach to Leora's interest in the Golden Needle, it is the trial court's duty to accord value to assets where evidence to that effect is introduced. This is so no matter how difficult that task may be. Thus, based upon our review of the record we conclude that the trial court erred by failing to value Leora's interest in the Golden Needle. On remand, the trial court is instructed to value this asset and include it as part of the marital estate subject to distribution.

#### 3. The Four Mobile Homes

Included among the Brooks' marital assets were four mobile homes. The trial court originally ordered that the mobile homes were to "remain on the premises of

the trailer park and be ... sold as assets of the trailer park." In October 1985 the trailer park was sold. However, the four mobile homes were not sold with the property because the purchaser did not make a reasonable offer on them.

In November 1985, Leora filed a motion seeking a judgment against Vern for $35,-000 to cash out her interest in the mobile homes. She also requested the motion be heard on shortened time. The court granted this request and a hearing was held on December 3, 1985. At this hearing, Vern's attorney questioned Leora's valuation of the mobile homes and asked for an opportunity to fully oppose the motion. The trial court denied this request and granted judgment on behalf of Leora for $35,000. The trial court based its decision on Vern's failure to turn over title to the mobile homes to Leora in a timely fashion as required by the property division order.

Vern contends that the trial court's refusal to allow him 10 days to fully oppose the entry of judgment and the reasons for the entry of the judgment constituted "discretionary abuses." Leora, on the other hand, contends that Vern's failure to turn over title to the mobile homes to her, as required by the court's property division order, is ample support and justification to accept her valuation and impose judgment accordingly.

Resolution of this issue is found in our recent decision in *Gabaig v. Gabaig*, 717 P.2d 835 (Alaska 1986). In that case, the trial court ordered the husband to dissolve a family trust and turn over title to various of his properties to a trustee so they could be valued and sold. *Id.* at 838. The husband refused to obey the order and the trial court valued the properties at the highest value indicated by the testimony and imposed a judgment for that amount. *Id.* at 842–43. On appeal, we upheld the trial court's decision finding, *inter alia*, that such a valuation was not "clearly erroneous." *Id.* at 843.

 The facts in this case closely parallel those in *Gabaig*. The trial court ordered both parties to "execute within 10 days, all deeds, notes and other documents necessary to effectuate the property division." Vern had title to the mobile homes in his name. Yet, despite the fact that only Leora was empowered to sell the mobile homes, Vern disobeyed the court's order and refused to convey title to her. Consequently, the trial court valued the mobile homes based upon the only evidence it had before it and entered judgment accordingly. In light of *Gabaig*, we conclude this holding is not clearly erroneous.

 Furthermore, the trial court did not abuse its discretion in refusing to allow Vern 10 days to answer Leora's motion. Under Civil Rule 77(i), motions for shortened time do not require that a party be given ten days to respond; rather, a 24–hour notice is all that is required. Alaska R.Civ.P. 77(i)(3). Moreover, while Vern's attorney may have had only two "working days" with which to respond to Leora's motion, he had at least six consecutive days. This is more than ample time in which to respond to Leora's straightforward motion. Consequently, Vern's argument is unpersuasive.

#### D. *The Trial Court's Division of the Brooks' Assets*

Vern argues that the trial court made two errors affecting the Brooks' property division as a whole. He contends that the trial court abused its discretion by finding that an equal division was warranted but not dividing the property equally, and that it erred in its division of the equity in the Brooks' trailer park. Because our resolution of other issues requires remand of this case for redivision of the Brooks' marital property, we are unable to tell whether the trial court did divide the Brooks' property unequally. Thus, we cannot reach Vern's first argument. Consequently, we turn to Vern's second assertion of error.

The Brooks purchased the Sunset Mobile Home Park (Park), a 92 space trailer park located in east Anchorage, in May of 1981 for $900,000. At the time of divorce the Park was valued at $1,786,000 with an eq-

uity of $1,297,583. The trial court held that the Park was a marital asset and that the equity was to be divided equally.[28]

Vern argues that the equal division of the Park is inappropriate when the *Merrill*[29] factors are considered. Thus, since the trial court failed to articulate the basis for its decision in terms of the *Merrill* factors, Vern contends that a remand on the issue is necessary.

■■■■■■■ Vern's argument is wholly unpersuasive. An equal division of property is presumptively valid, *Brooks*, 677 P.2d at 1230; *Merrill*, 368 P.2d 546, 548 n. 10 (Alaska 1962). Moreover, the trial court's reliance on the parties' prenuptial agreement provides an "adequate basis for the conclusion reached." *Id.* Each party was awarded a one-half interest in the equity of the trailer park, in accordance with the prenuptial agreement. Moreover, when the trailer park was sold, the proceeds of the sale were actually divided 50–50. Vern presents no compelling or even rational reason why this finding should be overturned. Consequently, there was no error and the trial court's determination on this issue is affirmed.

### E. *Attorney's Fees and Costs*

The property division order requires the parties to bear their own attorney's fees and costs except that the appraisal cost and witness fees of Leora's appraiser were to be borne by the marital estate. Vern argues that it was an abuse of discretion for the trial court not to award him at least partial costs and attorney's fees.

The trial court's discretion in awarding attorney's fees is broad, *Rostel v. Rostel*, 622 P.2d 429, 432 (Alaska 1981), and its decision will not be disturbed on appeal unless it is "arbitrary, capricious, manifestly unreasonable, or stems from an improper motive." *Tobeluk v. Lind*, 589 P.2d 873 (Alaska 1979). Because this case must be remanded, the trial court's attorney's fees

determination must be vacated pending re-division of the Brooks' property. Thus, we express no opinion on this issue. We note however, that in a property division where each party receives over half a million dollars in assets, it is hard to see how it is arbitrary, capricious or manifestly unreasonable to require each party to bear his or her own attorney's fees.

### III. CONCLUSION

For the reasons set forth above the trial court's decision is AFFIRMED IN PART, REVERSED IN PART and REMANDED for reconsideration not inconsistent with the instructions set forth in the body of this opinion.

---

**28.** The equity was to be divided equally after Vern received credit for $100,000 of the purchase price which the trial court found was his separate asset.

**29.** *Merrill v. Merrill*, 368 P.2d 546, 547 n. 4 (Alaska 1962).