NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JOHN MCCORMICK, | ) | |
| | ) | Supreme Court No. S-15736 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-13-08795 CI |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| VIRGINIA MCCORMICK, | ) | AND JUDGMENT* |
| | ) | |
| Appellee. | ) | No. 1554 – September 16, 2015 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Gregory Miller, Judge.

Appearances: Carl D. Cook, Law Office of Carl D. Cook, P.C., Anchorage, for Appellant. Jimmy E. White, Hughes Gorski Seedorf Odsen & Tervooren, LLC, Anchorage, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

I.      INTRODUCTION

In its order granting a husband and wife's divorce, the superior court found that a construction business the husband had started before the marriage was marital property, as was all equipment used or owned by the company. The court also decided that it was equitable to split the marital assets 50/50. The husband appeals the trial court's determination that certain construction equipment purchased before the marriage

---

\*      Entered under Alaska Appellate Rule 214.

was transmuted into marital property. He also appeals the 50/50 split, alleging that the superior court abused its discretion by failing to give adequate weight to his health issues and the differences in the parties' health insurance. Because the superior court correctly found that the wife's participation in the business rendered it and all of its assets marital, and because the superior court's 50/50 split was not an abuse of discretion in light of the severity of health issues both parties presented, we affirm.

## II.    FACTS AND PROCEEDINGS

Virginia and John McCormick were married on October 11, 2003 and separated on August 1, 2013. They had two children, one born in 2004 and the other in 2006. The McCormicks' divorce trial was held in September 2014.

John has worked in construction for more than 20 years. He briefly attended college but did not graduate. Virginia has a college degree, and she has worked in administrative roles, serving as an administrative assistant and legal secretary before the marriage and a paralegal since the separation. During much of the marriage, she worked full time on office matters for Alaska Diversified Contractors, the construction business John started some time prior to February 2002 and continues to operate.

Before the marriage, John purchased equipment that Alaska Diversified Contractors has used before, during, and after the marriage. In June 2002 John organized the company as a limited liability company. On October 11, 2003, the McCormicks' wedding day, John and Virginia signed an operating agreement. This agreement called on Virginia to make a capital contribution of "services" valued at $51,000 in March 2008 and on John to make a capital contribution of "expertise" valued at $49,000 on the same date. This 51/49 split in ownership in favor of Virginia was reiterated in a November 2004 Notice of Change of Officers, Directors, or Shareholders that the McCormicks filed with the State and in Alaska Diversified Contractors' 2014 biennial report, also filed with the State. John testified that Virginia was made a 51% shareholder

of Alaska Diversified Contractors because she was a woman and a Native American, and thus qualified the company for "8(a) set-asides," a provision of federal contracting law that offers business assistance to small businesses owned and controlled by socially and economically disadvantaged individuals.[1]

Before the trial, the parties jointly agreed to use Duane Hill of Alaska Auction Company to appraise items owned or used by Alaska Diversified Contractors. Hill appraised 171 items. Virginia accepted Hill's appraisal values and argued that all of the items were marital property. John argued that Hill had misvalued four items and that 60 of the 171 items were pre-marital. He testified that those 60 items were purchased and paid off before marriage and never transferred or sold to Alaska Diversified Contractors. For six of the 60 items, John provided exhibits documenting his pre-marriage acquisition of the items. He testified that this property was "stand-alone property that [he] allowed the business to use."

The trial also featured testimony and evidence of both John's and Virginia's health issues. John testified about a chemical freeze accident on both of his hands in the early 1990s that still affected him. He also testified that he had been diagnosed with rheumatoid arthritis, which had manifested as chest pain that kept him up at night. John testified that his condition impaired his ability to work based on how little he was able to sleep, and that while medication had worked on his joint pain it was an ineffective remedy for the disease's effects on his internal organs. He testified that he believed that the disease would impair his ability to earn a living in the future and had already decreased his earnings, although he could not estimate the amount of that decrease. He

---

[1]    *See generally* 15 U.S.C. § 637 (2012); 8(a) Business Development/Small Disadvantaged Business Status Determinations, 13 C.F.R. § 124.1 *et seq.* (2015).

testified that he expected to make "between $40,000 and $50,000 per year for the next couple of years," but that "anything down the road [was] questionable."

John also testified that he paid $350 per month for his medical insurance, which was an "ambulance policy" that covered "a small portion of doctor bills" and was "mainly for major medical" problems. He testified that he had spent thousands of dollars on medical care, while Virginia had free medical care available to her through the Native hospital. John's trial brief alleged that in 2013 he "paid approximately $30,000 in medical bills, while [Virginia] receives free medical care through ANMC," the Alaska Native Medical Center.

Dr. John Botson, a qualified expert in rheumatoid arthritis and John's treating physician, testified that John suffered from a "fairly rare" form of rheumatoid arthritis that affected not only his joints but also, potentially, his heart. Dr. Botson testified that it was difficult to predict how the disease's progression could affect his ability to work, but that it could limit that ability. He testified that John currently had "mild limitations" due to joint pain and no current cardiac damage, but that there were markers of future damage. Dr. Botson said it was "hard to give a time frame," and that greater damage could happen in "a few years" or in "fifteen to twenty," but that either way there was a high risk of progression, which "very well could" limit John's ability to work. Dr. Botson also testified that no medication to date alleviated John's joint pain without unacceptable side effects. A report on John's symptoms and diagnosis that Dr. Botson prepared was consistent, noting the same pain and problems with medication side effects to date and the difficulty of predicting disease progression and its impact on John's ability to work.

On cross-examination Dr. Botson testified that John's rheumatoid arthritis would not limit his ability to do certain tasks in the construction field, such as "supervising" and "estimating." He also testified that if John's disease did include

cardiac involvement, which he deemed likely, and adequate medication was not found, his best prediction was that John would face "significant disability" "within the next five to ten years."

Virginia also testified about her own health issues. She explained that she had access to the Alaska Native Medical Center, but that not all of her expenses were covered. Although her recent knee surgery was covered, elective care was not, and ANMC was "very conservative" in what they deemed elective; for example, Virginia had to pay out of pocket for certain back and jaw treatments. She described three back ailments with which she had been diagnosed — scoliosis, spondylosis, and spina bifida — all of which sometimes caused debilitating pain. Virginia testified at trial that she was employed as a paralegal and legal assistant and made roughly $46,000 per year.

On October 13, 2014, Superior Court Judge Gregory Miller granted the divorce. The court gave Virginia and John joint physical and legal custody of the children and ordered child support pursuant to Rule 90.3. The parties do not appeal these rulings. The form the superior court used to order custody also provided that "[c]hild and medical support should [b]e ordered in accordance with Alaska Civil Rule 90.3."

The superior court also issued supplemental findings of fact and conclusions of law. The bulk of the superior court's order dealt with property division. The court explained that although both parties requested a greater share of the estate, its application of the factors listed in *Merrill v. Merrill*[2] and AS 25.24.160(a)(4) did not reveal "any reason to alter the presumption that marital assets should be divided 50-50." The court compared the parties' education and work histories and determined that they "both gross about the same per year." It also found that the parties would have equal custody and "have equal financial needs."

---

[2]     368 P.2d 546, 547 n.4 (Alaska 1962).

The superior court also found that the parties' respective health conditions did not provide a reason to alter the 50-50 split of the estate. The order stated that "[t]heir health insurance has been addressed in this court's custody order." The court discussed John's "credible evidence that he is suffering from rheumatoid arthritis" that caused him pain and was progressing, but noted that "his doctor testified that John's medical condition does not currently affect John's ability to perform all his work tasks and that John has no limitations due to any medical condition, and that it may be anywhere from five to twenty years before the disease limits John, and then in an unknown amount." The court also discussed Virginia's testimony "that she is suffering from recent knee surgery and genetic back problems of spondylosis and scoliosis," but noted that "she offered no evidence as to how this might affect her future earning abilities."

The superior court's order then dealt with the property whose value and status as marital or non-marital was disputed. The court determined that the McCormicks' home, which John received, was marital, but adopted John's proposed valuation. The court's order also adopted John's proposed valuation for a lot that the parties agreed Virginia would receive. The court determined that it could not allocate a vague "other personal property" category, and it valued and allocated two vehicles and two retirement accounts.

Regarding Alaska Diversified Contractors and the associated equipment, the superior court's order highlighted two relevant court decisions. First, the superior court relied on four factors relevant to whether separate property had transmuted to marital property from *Keturi v. Keturi*: "(1) the use of property as the parties' personal residence, and (2) the ongoing maintenance and managing of the property by both parties, as well as (3) placing the title of property in joint ownership and (4) using the

credit of the non-titled owner to improve the property."[3] The trial court also cited *Dunn v. Dunn* for the proposition that "[s]eparate property becomes marital only upon a showing that the parties intended to treat [it] as marital."[4]

The superior court detailed the extent to which John and Virginia were effectively equal members in the business. Turning to "the items of heavy equipment that John owned prior to the marriage," the superior court noted that "the evidence established that over the years the parties used all of the equipment for their business, that they used business funds to maintain the equipment, that they depreciated at least some of the equipment on their company tax returns, and that they in all ways treated the equipment as 'theirs.'" The order stated that "nothing in the trial record evidences any intention by either party to deem the equipment as *not* having become business property jointly owned by the parties," and in a footnote noted that "John offered no evidence that he even once over the years used any of the equipment in a manner consistent with it being just 'his.'" Therefore the superior court deemed all 171 items marital property. The court adopted Hill's valuation for all items, including the four items John had proposed valuing differently.

With all of the property valued and assessed as marital or non-marital, the superior court divided it between John and Virginia. All of the business equipment was assigned to John, as was an account reflecting 2013 profit from Alaska Diversified Contractors. The superior court calculated that "John owes Virginia $206,943" as an equalization payment.

John appeals. He argues that the superior court erred by classifying the equipment he had purchased prior to the marriage as marital, by failing to give proper

---

[3] 84 P.3d 408, 417 (Alaska 2004).

[4] 952 P.2d 268, 273 (Alaska 1998).

weight to his medical issues when equitably dividing the marital assets, and by failing to adequately consider his diagnosis of a rare form of rheumatoid arthritis.

## III. STANDARD OF REVIEW

"The characterization of property as separate or marital may involve both legal and factual questions. Underlying factual findings as to the parties' intent, actions, and contributions to the marital estate are factual questions. Findings of fact are reviewed for clear error, but whether the trial court applied the correct legal rule in exercising its discretion is a question of law that we review de novo using our independent judgment."[5]

After a trial court determines what property is marital and what value it has, "the trial court must equitably allocate the property, a ruling which we review under the abuse of discretion standard; we will not disturb the allocation unless it is clearly unjust."[6]

## IV. DISCUSSION

### A. There Was No Error In The Superior Court's Determination That The Heavy Equipment Was Marital Property.

Property that is acquired before marriage "is not property 'acquired only during marriage.' "[7] "Therefore, it can only be treated as marital property if it was

---

[5] *Young v. Kelly*, 334 P.3d 153, 156 (Alaska 2014) (quoting *Beals v. Beals*, 303 P.3d 453, 459 (Alaska 2013)).

[6] *Hansen v. Hansen*, 119 P.3d 1005, 1009 (Alaska 2005) (citing *Moffitt v. Moffitt*, 749 P.2d 343, 346 (Alaska 1988)).

[7] *Green v. Green*, 29 P.3d 854, 858 (Alaska 2001) (quoting AS 25.24.160(a)(4)).

transmuted into such property through the parties' intent and actions demonstrating that intent."[8]

We have previously addressed a situation quite like the McCormicks'. In *Green v. Green* the husband, a commercial pilot, owned a Cessna 180 before the marriage.[9] During the marriage the pilot and his wife jointly ran "McCarthy Air, a flight-seeing and air taxi service. . . . [The pilot] conducted all of the flying for the business, while [his wife] participated by managing the office and performing other assorted tasks."[10] It was "undisputed that McCarthy Air was marital property," and that "[t]he business ha[d] expended significant funds to maintain and upgrade the airplanes."[11] The superior court found "no attempts by [the pilot] to segregate any pre-marital asset from the common enterprise," and determined that "[t]he parties used these assets exclusively as joint property throughout the marriage, never segregating the use, profits or the expenses of any asset."[12] It therefore characterized all the assets as marital.

---

[8]    *Id.* (citing *Wanberg v. Wanberg*, 664 P.2d 568, 571 (Alaska 1983); *Nicholson v. Wolfe*, 974 P.2d 417, 423 (Alaska 1999)). Separate property can also become marital through the doctrine of active appreciation, which "occurs when marital funds or marital efforts cause a spouse's separate property to increase in value during the marriage." *Odom v. Odom*, 141 P.3d 324, 333 (Alaska 2006) (quoting *Harrower v. Harrower*, 71 P.3d 854, 857-58 (Alaska 2003)). This doctrine does not apply to the equipment at issue in this appeal.

[9]    29 P.3d at 856.

[10]    *Id.*

[11]    *Id.*

[12]    *Id.* at 858 (quoting superior court).

We affirmed, holding that the Cessna 180 had been transmuted into marital property. We based this conclusion on two facts: "the extensive use of the plane in the family business and the substantial investment by the business in the upkeep and upgrades of this plane," which had required a $30,000 repair during the marriage.[13]

This case is strikingly similar to *Green*. John, like the pilot, was engaged in his business before the marriage and owned equipment that contributed to his ability to do his job. Virginia, like the pilot's wife, worked for the company in a clerical and managerial capacity during the marriage. Alaska Diversified Contractors, like McCarthy Air, was marital property, a finding that John does not appeal. The equipment at issue, like the Cessna 180, was used extensively in the family business.

John distinguishes this case from *Green* by pointing out that "there was no evidence of significant modifications, repairs or any substantial investment into the equipment that [he] identifies as his separate property." John claims that the only marital funds spent on the separate equipment were for routine maintenance and do not rise to the level of investment which requires transmutation of his separate property. This argument puts too much emphasis on the fact of the Cessna repairs in *Green*, which were not dispositive. In *Green* the pilot also argued that a different plane, a Piper Super Cub, should not have been considered marital property because, although it had been purchased during the marriage, he contended it had been purchased solely with pre-marital funds.[14] We affirmed the superior court's conclusion that it did not need to determine whether marital funds were used in the purchase of the Super Cub "because even if it was [the pilot's] separate property as of [the purchase date], it became a marital

---

[13]    *Id*. at 859.

[14]    *Id*.

asset during the marriage."[15]  The absence of a major repair to the Super Cub did not make "[t]he trial court's findings of joint use and management and intention to transmute" that plane clearly erroneous,[16] and the similar absence of any major repair or alteration to the equipment at issue in this appeal does not render the trial court's findings that they were transmuted into marital property erroneous.[17]

B.  **The Superior Court's Equal Division Of The Marital Estate Was Not An Abuse Of Discretion.**

Alaska Statute 25.24.160(a)(4) directs the trial court to "fairly allocate the economic effect of divorce" based on nine factors:

> (A)    the length of the marriage and station in life of the parties during the marriage;
>
> (B)    the age and health of the parties;
>
> (C)    the earning capacity of the parties, including their educational backgrounds, training, employment skills, work experiences, length of absence from the job market, and custodial responsibilities for children during the marriage;
>
> (D)    the financial condition of the parties, including the availability and cost of health insurance;

---

[15]  *Id.*

[16]  *Id.*

[17]  There was an additional reason to reject John's argument that the equipment was his separate property:  From the beginning some or all of it might have in fact belonged to Alaska Diversified Contractors rather than John personally.  John produced two bills of sale for contested items that identified Alaska Diversified Contractors as the purchaser, and some of the contested items were included in the depreciation tables of Alaska Diversified Contractors' tax returns.  There is no evidence that Alaska Diversified Contractors ever entered into any agreement with John regarding the equipment's use, as might be expected when one entity uses equipment owned by a different party.  And John has not appealed the superior court's determination that Alaska Diversified Contractors, and therefore all of its assets, belonged to the marital unit.

(E)     the conduct of the parties, including whether there has been unreasonable depletion of marital assets;

(F)     the desirability of awarding the family home, or the right to live in it for a reasonable period of time, to the party who has primary physical custody of children;

(G)     the circumstances and necessities of each party;

(H)     the time and manner of acquisition of the property in question; and

(I)     the income-producing capacity of the property and the value of the property at the time of division.

"[I]n making an equitable division of the property, the superior court must state the facts forming the basis of the division and address the relevant statutory factors."[18] "The equal division of the marital estate is presumptively valid."[19]

On appeal John argues that the superior court should have granted him an unequal division of the marital assets for two reasons: The effect his health issues were anticipated to have on his earning capacity and the anticipated cost of addressing those health issues. We conclude that neither of these reasons demonstrates that the superior court's equal division of the marital estate was an abuse of discretion.

In this case both parties sought a majority of the marital estate. John's trial brief justified this request by reference to his health issues and their likely impact on his future earning capacity. John's attorney reiterated this health basis for the requested 60/40 split at closing argument. Virginia's trial brief touched on more topics, referencing both the parties' health and arguing that "John is leaving with his home and business while [Virginia] is starting what amounts to a new life with limited skills and experience

---

[18]     *Tollefsen v. Tollefsen*, 981 P.2d 568, 570 (Alaska 1999).

[19]     *Odom v. Odom*, 141 P.3d 324, 330 (Alaska 2006) (citing *Brooks v. Brooks*, 733 P.2d 1044, 1058 (Alaska 1987)).

relative to her occupation." At closing argument Virginia's attorney also focused on the fact that Virginia was entering a new field of employment as the basis for her requested 55/45 split and argued that John's health issues were not a current impediment to his employment.

The superior court's order identified "the factors set forth in *Merrill v. Merrill* and AS 25.24.160(a)(4)" as the basis for dividing marital property. The superior court's explanation of its decision to divide the marital estate evenly touched on all of the required factors, including the ten-year duration of the marriage, the educational and experiential factors that influenced John's and Virginia's earning capacities, the financial needs of each party, and the absence of any improper depletion of marital property. The superior court recounted the evidence of John's rheumatoid arthritis and Dr. Botson's testimony "that it may be anywhere from five to twenty years before the disease limits John, and then in an unknown amount." And the order summarized Virginia's testimony about her "recent knee surgery and genetic back problems of spondylosis and scoliosis," but noted that "she offered no evidence as to how this might affect her future earning abilities." None of the factors convinced the superior court "to alter the presumption that marital assets should be divided 50-50."

John cites *Heustess v. Kelley-Heustess*, a case in which this court determined that a 65/35 split in favor of a wife who the superior court found could not work due to her health and whose husband's income was "significantly greater" — a fact that was "undisputed" — did not fail on those grounds.[20] But the fact that the superior court in *Heustess* did not abuse its discretion by making an unequal division under those facts does not mean that the superior court abused its discretion by making an equal split here. In this case both parties testified that their current annual incomes were between

---

[20]     *See* 259 P.3d 462, 473-74 (Alaska 2011).

$40,000 and $50,000 per year. Dr. Botson's testimony and report on John's illness noted the difficulty in projecting the future limitations John's arthritis could impose on his earning capacity. The future effects of Virginia's health issues were also speculative, but she did testify about problems with her back and knees. The superior court considered all of this evidence in its order, and it did not abuse its discretion when it concluded that neither John nor Virginia had demonstrated that their health problems required a departure from the presumption of an equal division of marital assets.

John also argues that the superior court's consideration of the medical costs of addressing his arthritis was inadequate. He points out that the superior court's statement in its order that John's and Virginia's "health insurance [coverage] has been addressed in [the] custody order" appears to have been an error; the custody order only discusses the children's health insurance, not the parents'. John argues that the superior court's failure to explicitly address the fact that Virginia received free health insurance coverage through ANMC while his health insurance and treatment costs were privately funded amounts to an abuse of discretion.

In support of his argument, John cites *Day v. Williams*, a case in which we reversed an equal division of marital assets in part because "[t]he superior court did not make a specific finding regarding the parties' health insurance, although the issue was addressed at trial."[21] As the *Day* court recognized, "Alaska Statute 25.24.160(a)(4)(D) specifies that cost of health insurance is an element of the parties' financial condition,"[22]

---

[21]     285 P.3d 256, 262 (Alaska 2012).

[22]     *Id.* at 263.

and thus should be considered when the superior court seeks to "fairly allocate the economic effect of divorce."[23]

However, *Day* does not stand for the proposition that the superior court must make explicit findings about health insurance costs in every divorce case. In *Day* the superior court not only failed to make findings about health insurance, it "made no findings under AS 25.24.160(a)(4) or *Merrill*, nor did it . . . explain its reasoning in dividing the marital estate equally" other than to say that doing so was "fair" and would allow the wife to transition into post-marital life.[24] In discussing why the superior court should have made explicit findings about health insurance "under the circumstances of [that] case,"[25] the health concerns we noted were one-sided, exclusively affecting the party who "had a much [lower] earning capacity . . . even . . . before she experienced her eye problems."[26] In addition to her "substantial health care concerns," the superior court "acknowledg[ed] that it was concerned [she might] not be able to afford to keep the duplex."[27] Moreover, our remand in *Day* did not direct the superior court to award the wife a majority of the marital estate; instead, we "remand[ed] for additional findings," which would "provide sufficient information to permit meaningful review."[28]

The evidence and testimony the McCormicks presented and the depth of the superior court's order now before us distinguish this case from *Day*. The superior

---

[23]    AS 25.24.160(a)(4).

[24]    *Day*, 285 P.3d at 261-62.

[25]    *Id.* at 263.

[26]    *Id.* at 262.

[27]    *Id.*

[28]    *Id.* at 263.

-15-                                                          *1554*

court's order explicitly identified and discussed the factors set out in *Merrill* and AS 25.24.160(a)(4). Although the order's analysis of health insurance was conclusory, we have held that " 'the trial court need not make findings pertaining to each factor,' so long as its findings are 'sufficient to indicate the factual basis for the conclusion reached.' "[29] Here, the superior court indicated that although both John and Virginia testified about their medical costs, "th[e] court [did] not find any reason to alter the presumption that marital assets should be divided 50-50." The fact that John and Virginia both testified that they had recently made significant out-of-pocket health expenditures and both predicted that they would face further medical costs in the future provides strong support for the superior court's conclusion. Because John and Virginia both have similar economic potential and both face health conditions that, while unpredictable, will likely require further private medical spending, the superior court's determination that the health insurance issue did not require a departure from the "presumptively valid" equal division of marital assets[30] was not an abuse of discretion.

## V.    CONCLUSION

We AFFIRM the superior court's order.

---

[29]    *Helen S.K. v. Samuel M.K.*, 288 P.3d 463, 479 (Alaska 2012) (quoting *Young v. Lowery*, 221 P.3d 1006, 1014 (Alaska 2009)).

[30]    *Odom v. Odom*, 141 P.3d 324, 330 (Alaska 2006) (citing *Brooks v. Brooks*, 733 P.2d 1044, 1058 (Alaska 1987)).