Karen D. SANDERS, Appellant,

v.

Thomas A. SANDERS, Appellee.

No. S–6586.

Supreme Court of Alaska.

Sept. 8, 1995.

---

Dennis P. James and Keith A. Christenson, Anchorage, for appellant.

Jennifer L. Holland and Max F. Gruenberg, Jr., Gruenberg and Clover, Anchorage, for appellee.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

## OPINION

MOORE, Chief Justice.

## I. INTRODUCTION

This dispute arises out of the divorce of Karen and Thomas Sanders. Karen appeals several aspects of the superior court's division of marital property, its order that she make payments to Thomas for the support of the couple's adult son, and its order that she

pay $8500 of Thomas' attorney's fees. We affirm in part and reverse in part.

## II. FACTS AND PROCEEDINGS

Karen and Thomas Sanders were married in 1965. They have two adult children, Kenneth and Michelle, who were over the age of eighteen when their parents permanently separated on October 1, 1992.

In January of 1993, Thomas filed a complaint for divorce. After a three day trial, the superior court evenly divided the marital property. The most contentious property division issue involved the classification of a Bristol Bay limited entry fishing permit worth $150,000, which Thomas acquired during marriage. According to both Thomas and Michelle, Karen and Thomas decided that the permit should be given to their children. In January 1992, Thomas signed a notice of intent to transfer the permit to Michelle. The permit did not officially change hands until early November, however, several weeks after the Sanders' separation. Notwithstanding Karen's testimony that she thought the transfer was only temporary and not an outright gift, the trial court found that Karen and Thomas had given Michelle the permit to hold in trust for herself and Kenneth. The court therefore excluded the permit from the marital property.

The court also ruled that Karen had a duty to contribute to Kenneth's support during the eight month period immediately following the parties' October 1992 separation, while Kenneth was pursuing a high school degree. Based on the formula set forth in Civil Rule 90.3, the court determined that Karen owed Thomas $5040 in retrospective support.[1] Finding that Kenneth was unable to support himself due to his emotional problems, the court further ordered Karen to pay Thomas $500 per month toward Kenneth's maintenance for as long as Kenneth lived with his father and was unable to support himself. The court specified, however, that Karen's

prospective support obligation was subject to quarterly review.

Finally, the court ordered Karen to pay $8500 of Thomas' attorney's fees in order to equalize the parties' legal expenses. This appeal followed.

## III. DISCUSSION

■ A. The Lower Court's Support Order

Karen argues that she is not liable for Kenneth's support, that the amount of support established by the court was improper, and that the court failed to establish identifiable standards for continuing review of the support payments. We review child support awards under an abuse of discretion standard. Murphy v. Murphy, 812 P.2d 960, 962–63 (Alaska 1991). Whether the trial court applied the correct legal standards in making its determination is a question we review de novo. Lantz v. Lantz, 845 P.2d 429, 431 n. 1 (Alaska 1993).

■ "The duty of support generally exists only until the children 'are emancipated or reach the age of majority,' which is by statute eighteen years." Streb v. Streb, 774 P.2d 798, 800 (Alaska 1989) (citations omitted); AS 25.20.020. Two exceptions to that general rule apply here.

First, AS 25.24.140(a)(3) provides for the support, under special circumstances, of children who have reached their eighteenth birthday. In a divorce action

a spouse may ... be awarded expenses, including ...

. . . .

(3) reasonable care for minor children in the care of the spouse and *reasonable support for unmarried 18–year–old children of the marriage who are actively pursuing a high-school diploma or an equivalent level of technical or vocational training and living as dependents with the spouse* or designee of the spouse, if there is a legal obligation of the other spouse to provide support.

---

1. Plaintiff's exhibit 38 ("Child Support Guidelines Affidavit") uses Rule 90.3's formula to calculate child support based on an average of Karen's paystubs for November 1992 and May 1993. The monthly support amount, $630.00, was multiplied by eight to arrive at a $5040 award for the period encompassing October 1992 through May 1993.

(Emphasis added.) At trial, Karen's attorneys stipulated that this provision applied to Kenneth between October 1992 and May 1993, when he was pursuing a high school diploma. This appears to be the basis for the court's order that Karen pay Thomas $5040 in retrospective child support.

Second, we have held that the duty of support continues beyond the age of majority where "an adult child is incapable of supporting himself or herself by reason of a physical or mental disability." *Streb*, 774 P.2d at 800. While the court's prospective child support order does not cite *Streb*, that case was argued by the parties and thus appears to be the basis for the court's $500 per month support order.

1. *The court did not err in awarding $5040 in retrospective support for the period when Kenneth was pursuing a high school degree*

■ Although Karen concedes her obligation to contribute to Kenneth's support between October 1992 and May 1993, she argues that the trial court erred in computing that liability at $5040. The court calculated the retrospective support award using the formula set forth in Civil Rule 90.3, and Karen argues that the Rule does not apply to the calculation of support for an adult dependent.

Karen points to *Streb*'s statement that "Civil Rule 90.3 ... does not govern an award for a handicapped adult," 774 P.2d at 801, and also notes that the unofficial commentary to Rule 90.3 states that the Rule "does not apply to set any support which may be required for adult children." Civil Rule 90.3 Commentary I.C. She urges us to calculate retrospective support using the *Streb* standard, which says an award should be a "fair percentage of funds actually spent on reasonable child care expenses." 774 P.2d at 801.

■ We agree with the trial court that Rule 90.3 should apply to a determination of support mandated by AS 25.24.140(a)(3). *Streb*'s rejection of a Rule 90.3 calculation

has no relevance when support is mandated by AS 25.24.140(a)(3). That statute simply acts to postpone the age of majority, for child support purposes, of dependent children living at home and pursuing a high school or similar degree. Support payments for those children will have been calculated under Rule 90.3 until they reach eighteen years of age, and it makes sense to extend those payments under AS 25.24.140(a)(3), rather than to employ an entirely new standard of calculation for the relatively short period in which they will be subject to the statute.

2. *The court did not err in imposing on Karen a prospective support obligation*

■ *Streb* imposes a support obligation where "evidence [shows] that an adult child is incapable of supporting himself or herself by reason of a physical or mental disability." *Streb*, 774 P.2d at 800. Based mainly on the testimony of Dr. Patrick, a psychiatrist, the superior court found that

Kenny needs parental support, even though he is an adult, until he accomplishes what can be accomplished at [the Division of Vocational Rehabilitation] and is able to be employed.... The support will continue so long as Kenny lives with Tom, and it will continue only so long as he is unable to fully support himself due to the emotional problems described by Dr. Patrick.

Karen disputes the trial court's conclusion that *Streb* imposes on her a duty to support Kenneth. She directs our attention to the evidence supporting her contention that Kenneth is capable of supporting himself[2] and complains that the court's determination of incapacity occurred without hearing testimony from Kenneth or obtaining an independent evaluation. Karen notes that AS 13.26.005 (defining "incapacitated person" for purposes of establishing guardianship) mandates a more rigorous procedure before a determination of incapacity is made, and im-

---

2. Kenneth has completed the requirements for a high school diploma, owns and operates a motor vehicle, has been denied disability benefits by Social Security, and possesses the legal status of an independent adult (i.e., has no legal guardian).

plies that this procedure should have been used here.[3]

In response, Thomas points to his own testimony and the testimony of Dr. Patrick. This evidence indicated that Kenneth had a history of hospitalizations and suicide attempts, had held a series of jobs for only short periods before being fired or leaving, and suffered from "bipolar illness, mixed type, with a secondary diagnosis of learning disability." Thomas also notes that the trial court found that

> Ms. Sanders says that he [Kenneth] can work, but has offered no evidence of it. In fact, she's surprisingly uninformed about his present situation.... I think his difficulties are something that she has translated into anger at him, rather than accepting them for what they are.

■ The superior court's conclusions with regard to Kenneth's abilities and his capacity for self-support amount to factual findings, and as such may be reversed only if clearly erroneous. Alaska Civil Rule 52(a). We will not reverse such determinations unless left with a "definite and firm conviction that a mistake has been made." *Murphy v. Murphy*, 812 P.2d 960, 964 n. 7 (Alaska 1991). There was evidence to support the trial court's findings, and they cannot be called clearly erroneous.[4] We therefore affirm the trial court's finding that Karen was liable to make support payments to Thomas.

### 3. *The court erred in setting the amount of prospective support*

■ Karen argues that the trial court erred by calculating her support obligation without regard to Kenneth's one-half ownership of two valuable income-generating fishing permits.[5]

■ There is authority for the proposition that an adult disabled child's "ability to provide for herself out of her own means must always be considered" when determining whether a parent has a continuing duty of support for that child. *Sayne v. Sayne*, 39 Tenn.App. 422, 284 S.W.2d 309, 312 (1955) (ordering support for disabled 27–year–old child); *see also* 59 Am.Jur.2d *Parent & Child* § 103 (1971) (citing *Sayne*).[6] We believe that the *Sayne* principle is economically sound and consistent with the rule set forth in *Streb*. We therefore incorporate it into *Streb*'s general rule for ordering support for an adult dependent child, and direct the superior court to reconsider Karen's support obligation in light of this principle.

Even without considering *Sayne*, however, we would be obliged to reverse the lower court's support award, because it was calculated in violation of *Streb*. As noted above, *Streb* requires that "the [support] award should be reasonably calculated to reimburse the moving party for a fair percentage of the funds actually spent on reasonable child care expenditures." 774 P.2d at 801. In this case, the court's finding of "funds actually spent" on Kenneth's support came from

3. Karen has also submitted an affidavit stating that Kenneth fished the Bristol Bay permit in the summer of 1994 and made approximately $30,-000. This is obviously information that was not before the trial court, since it concerns events that occurred after the trial. Karen may introduce this information at the quarterly review sessions where her support obligation will be examined, but we do not consider it here.

4. Karen's account of her son's post-trial income-earning activity may be correct, but as we explained above, the proper occasion for Karen to present that information is during one of the quarterly review opportunities established by the trial court.

5. Karen cites AS 25.20.040 in support of her claim that the court improperly ignored Kenneth's assets when it imposed the $500 per month support obligation. Alaska Statute 25.20.040 provides that, under certain circumstances, the expense of maintaining a child "may be defrayed out of income from the minor's property." The statute is unhelpful to Karen, however—mainly because it contains merely a permissive authorization, not a mandatory command, that a child's assets are available for use. AS 25.20.040. For the reasons described in the textual discussion that follows, however, we hold that Karen's more general objections to the trial court's computation of her support obligation have merit.

6. *Sayne* took care to note, however, that the fact that the child's estate must be considered in relation to the support ability of the parent does not mean that the child's property must be exhausted before contribution from the parent will be required. 284 S.W.2d at 312.

Thomas' estimated budget of $1460 per month. The court set Karen's support obligation at $500, an amount less than 50% of Kenneth's monthly expenses, in order to "motivate[ ] [Thomas] to help Kenny advance" toward self-sufficiency.

Thus in calculating the support award, the lower court apparently assumed that Thomas would personally spend the full $1460 needed to support Kenneth. That assumption, however, ignored the fact that the court also held that Kenneth was a 50% owner of a fishing permit worth $150,000. According to Michelle's testimony, this permit produced $30,000 per year in before-tax income to the permit-holder who fished it. Kenneth had fished the permit with his father and sister in 1992, and Michelle testified that Kenneth was expected to fish the permit again in 1994. Michelle also testified that she planned to sell the Norton Sound herring permit and split the money with Kenneth. This undisputed evidence of Kenneth's past and future income-earning capability disproves the central assumption of the court's calculation of Karen's support payments: that Thomas would be "out-of-pocket" for the entire $1460 per month needed to support Kenneth.

Because the court failed to properly calculate how much Thomas would "actually spen[d] on reasonable child care expenditures," *Streb*, 774 P.2d at 801, the derivative figure that Karen was ordered to pay as support is also in error. Consequently, the court's calculation of Karen's support obligation was an abuse of discretion and must be reversed. On remand, the court should calculate the amount of Kenneth's $1460 per month expenses that Thomas will be forced to "actually spen[d]." *Id.* Karen may then be ordered to pay a "fair percentage" of that amount. *Id.*

 Karen also claims that the court "failed to articulate its basis for assessing $500 per month" in support, and failed to "set any guidelines or standards to assist [her] in determining when to request a hearing and the nature of proof required [to change the support payments]."

We agree that in light of the facts of this case, the court should have differently structured the quarterly reviews of the support award. As noted, uncontested evidence indicated that Kenneth had income-earning capability, and the court found that "at some point, probably soon, Kenny will be able to at least partially support himself." Under these circumstances, we hold that the court's order should be modified to make clear that on quarterly review it will be incumbent on Thomas to demonstrate that Kenneth's disability, and thus the need for support, continues.

 With that modification in place, however, Karen has no basis to complain that the court's order lacks sufficient standards. The court stated that "support will continue so long as Kenny lives with Tom, and it will continue only so long as he is unable to fully support himself due to the emotional problems described by Dr. Patrick." These criteria, along with the standard set forth in *Streb*, provide adequate information to guide Karen during the quarterly reviews of the support order: the amount of the award will be modified if it no longer represents a "fair percentage of funds actually spent on reasonable ... care" for Kenneth. *Id.* As the court's findings imply, modification of the payments will be warranted if Kenneth is able to "at least partially support himself," and the payments to Thomas will cease altogether if Kenneth leaves home or becomes able to "fully support himself."

 **B.** *The Lower Court's Division of Property Was Not Erroneous*

Equitable division of marital assets by the superior court involves a three step procedure. First, the trial court must determine what specific property is available for distribution. Second, the court must find the value of this property. Third, it must decide how an allocation can be made most equitably.

*Wanberg v. Wanberg,* 664 P.2d 568, 570 (Alaska 1983). Karen's arguments regarding the court's division of property implicate each of *Wanberg*'s three steps. Karen argues that the Bristol Bay permit should have

been classified as marital property.[7] She claims that the court improperly valued Thomas' PERS state retirement benefits. Finally, she contends the court erred by awarding Thomas all of the family's vehicles. We review the trial court's division of property under an abuse of discretion standard. *Id.* Whether the trial court applied the correct legal standard is a question we resolve using our independent judgment. *Id.*

### 1. *The Bristol Bay permit*

■ The lower court found that Thomas and Karen gave the Bristol Bay permit to Michelle Sanders in constructive trust for her and her brother. We have held that a gift to a third person out of the marital property is valid when both spouses act together in making the gift. *Brooks v. Brooks,* 733 P.2d 1044, 1055 (Alaska 1987). "However, if both spouses do not join in making the gift, it is voidable at the option of the non-participating spouse." *Id.* Karen contends that the lower court erred in finding that an effective gift had occurred.

Karen claims that there was a "dearth of evidence regarding [her] donative intent," and thus essentially argues that *Brooks'* requirement that both spouses act together was not met. Second, she notes that the date when property should be classified as separate or marital is the date of separation. *Ogard v. Ogard,* 808 P.2d 815, 819 & n. 8 (Alaska 1991). This implies that since the permit was not officially transferred to Michelle until after the separation, the permit must be considered marital property. Finally, Karen points out that a donor must part with all present and future dominion over property before a gift *inter vivos* can be said to have occurred. *Boston Ins. Co. v. Beckett,* 419 P.2d 475, 477 (Idaho 1966). She argues that since Thomas had access to an account into which the family's fishing revenue was deposited, he did not divest himself of control over the permit, and thus the gift should not be considered valid.

■ But, as Thomas notes, the lower court heard sufficient testimony to allow it to conclude that Karen originally agreed that the permit should be transferred to Michelle, but then changed her mind during litigation and sought to void the gift. Additionally, Thomas' access to the bank account has no bearing on his control over a revenue-generating asset like the permit. Karen has not shown Thomas had any control over where Michelle deposited the proceeds from fishing the permit. There is no evidence that Thomas failed to fully relinquish the permit to his daughter.

■ The final point concerns the timing of the permit's transfer. The question is whether, in light of the trial court's finding that Thomas and Karen agreed to give the permit to their children, the permit can be excluded from marital property even though it was not formally transferred to Michelle until after the separation. We believe the trial court's disposition of this issue was correct. The gift of the marital asset at issue here does not give rise to the concerns implicated by *Brooks,* since (according to the trial court finding, which cannot be termed clearly erroneous) Karen acceded to the transfer. We therefore affirm the trial court's classification of the Bristol Bay permit.

### 2. *Thomas' retirement benefits*

■ Karen has forfeited her ability to complain that the court undervalued Thomas' PERS benefits, because her counsel stipulated to their value at trial. *See Oregon Auto. Ins. Co. v. Watkins,* 506 P.2d 179, 181 (Or.1973) (disallowing appeal of factual issue which had been subject of stipulation at trial).

### 3. *The family vehicles*

■ The court's award of the family's vehicles to Thomas does not constitute an abuse of discretion. Karen's argument overlooks the fact that the court divided the property equally: Thomas was credited with the value of each automobile and Karen was

---

7. At one point in her brief, Karen implies that she is also objecting to the court's disposition of a second fishing permit, a Norton Sound herring permit which Thomas purchased with separate property and later transferred to Michelle. Karen has not briefed this argument, and thus we will not consider it on appeal. *Kristich v. State,* 550 P.2d 796, 804 (Alaska 1976).

awarded items of offsetting value. Furthermore, Karen stated that she would sell the Audi to Thomas for $2500 [8] and that she did not want any of the other vehicles. Karen seems most upset about the loss of the Audi. But while that car may have been driven mainly or exclusively by her, it has no obvious intangible value that shows the court's financial ledger-balancing to be an abuse of discretion.

### C. The Lower Court Erred in Awarding Attorney's Fees

Karen's final argument is that the court erred by awarding Thomas $8500 in attorney's fees. The award of attorney's fees in divorce actions is within the broad discretion of the trial court. *Kowalski v. Kowalski*, 806 P.2d 1368, 1372 (Alaska 1991). Nevertheless, we agree that this fee award must be reversed.

Alaska Statute 25.24.140 provides that the court may order one spouse to pay an amount of fees and costs necessary to enable the other spouse to prosecute or defend the action. "The purpose of the statute is to 'assure that both spouses have the proper means to litigate the divorce action on a fairly equal plane.'" *Id.* (citation omitted). Thus the general rule with regard to fees in a divorce case is that

> [t]he relevant considerations for determining attorney's fees awards in divorce cases are the relative economic situation and earning power of each party. If the parties are in "comparable economic situations, each side should bear [its] own costs."

*Doyle v. Doyle*, 815 P.2d 366, 373 (Alaska 1991) (citations omitted).

The parties to this litigation possess relatively equivalent incomes [9] and, in the wake of the trial court's property division, equal assets. Nevertheless, the trial court awarded Thomas $8500 in attorney's fees, explaining that

> counsel and the submissions indicate $25,000 [in legal] fees from Tom, who had to bear the lion's share of the preparation. I think the record is quite convincing that ... almost all of the preparation of the case was done by [Thomas' attorney].... I think the parties should split the expense of this litigation evenly, and so it takes [an] $8500 [payment by Karen to Thomas] to put them in an equivalent position, with each paying about $16,500.

Karen appeals this award as inconsistent with the general rule that equally situated parties should bear their own fees. Thomas cites *Johnson v. Johnson*, 564 P.2d 71, 77 (Alaska 1977), for the proposition that the amount of fees expended by each party may be considered by a court in making an award. He also notes that fees can be awarded where one party causes unwarranted delay and unnecessary costs, *see Hartland v. Hartland*, 777 P.2d 636, 644 (Alaska 1989), and alleges that Karen is guilty of these offenses.[10]

Thomas' citations to authority are inapposite. His attempt to defend the fee award as the result of Karen's alleged misconduct fails, because "the court must make explicit findings of bad faith or vexatious conduct and clearly explain its reasons" when it departs from the general rule that equally situated parties will bear their own costs. *Kowalski*, 806 P.2d at 1373. The lower court made no such findings here. Thomas is also wrong to argue that the lower court "had authority under *Johnson* to place the parties in an equivalent financial position where there had been inequality in fees and ef-

---

8. This is effectively what happened, since Thomas was awarded the vehicle and credited with a $2500 asset on his side of the ledger.

9. Documents filed with the court show Thomas' income to be considerably higher than Karen's. Under the superior court's order, however, most of this disparity was scheduled to terminate, because Thomas was directed to sell a duplex and would consequently lose $1000 per month in rental income.

10. Thomas complains that Karen's "discovery responses were generally defective, forcing Tom to spend several extra hours of attorney time and money sorting through them." He also accuses Karen of forcing him to file an expedited motion and forcing him to come to a calendar call with a motion to resolve an issue to which Karen had failed to stipulate. Finally, he claims that Karen failed to pay half of the appraisals ordered in preparation for trial.

forts." In *Johnson,* we affirmed a trial court's decision to *deny* a fee award in a divorce case where marital property was divided evenly and each party was reportedly "bankrupt." 564 P.2d at 77. In other words, the trial court in *Johnson refused* to depart from the general rule that similarly situated parties bear their own costs.

As *Kowalski* explains, the purpose of the fee-shifting statute in divorce actions is to "assure that both spouses have the proper means to litigate the divorce action on a fairly equal plane." 806 P.2d at 1372 (citations omitted). In this case, the parties are equally situated economically. Thomas simply spent more resources preparing his case than Karen did preparing hers. This tactical litigation decision does not demonstrate the financial disadvantage that justifies an attorney's fee award in a divorce case. In fact, just the opposite is true: Thomas' expenditures evidence his ability to litigate the case aggressively.

The attorney's fee award in this case appears to be simply an extension of the lower court's desire to divide the marriage's assets and liabilities equally. But where parties in a divorce case are equally economically situated, the default rule with regard to attorney's fees is "to each his (or her) own," not "share and share alike." We find nothing in this case that justifies departure from that general rule. Consequently, we reverse the fee award as an abuse of discretion.

## IV. *CONCLUSION*

For the reasons described above, we AFFIRM the lower court's order that Karen pay Thomas $5040 in retrospective support; the court's determination that Karen is obligated to make prospective, quarterly-reviewable support payments to Thomas on Kenneth's behalf; and the trial court's division of property. We MODIFY the court's prospective support award, however, to clarify that Thomas bears the burden of showing the need for continued support at the quarterly review sessions. Because the court failed to properly calculate how much money Thomas would actually spend on Kenneth's expenses, we REVERSE and REMAND the court's calculation of the prospective support pay-

ment. We also REVERSE the trial court's award of attorney's fees.