*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| MARK DAUM,<br><br>               Appellant,<br><br>v.<br><br>KIMBERLY DAUM,<br><br>               Appellee. | Supreme Court No. S-17835<br><br>Superior Court No. 3AN-18-08291 CI<br><br>O P I N I O N<br><br>No. 7626 – October 14, 2022 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Andrew Guidi, Judge.

Appearances: Wayne Anthony Ross, The Law Office of Wayne Anthony Ross, Anchorage, and Rhonda F. Butterfield, Wyatt & Butterfield, LLC, Anchorage, for Appellant. Jimmy E. White, Hughes White Colbo & Tervooren, LLC, Anchorage, for Appellee.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

MAASSEN, Justice.

BORGHESAN, Justice, with whom WINFREE, Chief Justice joins, concurring.

CARNEY, Justice, dissenting.

## I. INTRODUCTION

A couple separated after three years of marriage. They had a son who was later diagnosed with several mental disabilities. The father paid child support until the son turned 19; when the son was in his twenties the father filed for divorce. The superior court entered a divorce decree and ordered the father to pay post-majority child support, finding that the son was unable to support himself by reason of his disability. The father appeals, arguing that the superior court lacked jurisdiction and the statutory authority to order post-majority support and that the court abused its discretion by ordering him to pay the entirety of the son's living expenses.

We affirm the superior court's exercise of jurisdiction and authority to issue the support order. However, because of an inconsistency in the support order's application, we remand it to the superior court for reconsideration of whether the father's support obligation — 100% of the son's living expenses — represents a fair percentage.

## II. FACTS AND PROCEEDINGS

### A. Facts

Mark and Kimberly Daum married in Anchorage in 1994 and in 1996 had a son, Nathan. The couple separated in 1997, and Kimberly moved with Nathan to Ohio. Kimberly has been Nathan's primary caretaker since the move. Nathan was diagnosed with Asperger's syndrome at age seven; at age 18 he was diagnosed with autism spectrum disorder, attention-deficit/hyperactivity disorder, and oppositional defiant disorder. Mark, who remained in Alaska, paid child support pursuant to an administrative order issued by the Alaska Child Support Services Division (CSSD) until Nathan turned 19.

## B.    Proceedings

Mark filed for divorce in 2018, when Nathan was 22.    Kimberly counterclaimed for child support for Nathan.  The superior court held a trial in October 2019.

Both Mark and Kimberly testified, along with Kimberly's mother. Testimony largely focused on Nathan's needs as they related to his ability to live independently and support himself.  Kimberly testified that Nathan had held a seasonal, part-time job as a rides operator at an amusement park for five years, earning approximately $12,000 per year.  She testified that although Nathan continued to live with her, he did not pay her "for any utilities or bills or cell phones" or "anything like that"; instead, she paid "for all of the living expenses."  She added that she and Nathan both contributed toward maintenance and insurance for a car Nathan used, but he spent his own income "mostly" on eating out.

Kimberly and her mother testified about various tasks Nathan struggled with and the ways Kimberly assisted him with those tasks.  According to Nathan's grandmother, he needed prompting and help doing laundry, going to doctor's appointments and the grocery store, and keeping the house clean.  Kimberly testified that she had to wake Nathan up in the morning to remind him to go to work.  She testified that she made Nathan's doctor's appointments and had "to get him up and ready and out the door to . . . be able to get to his appointment on time."  There was also testimony about an unsuccessful attempt Nathan made to live on his own through a charity-funded housing program.

Mark and Kimberly both testified about their income and earning potential. Kimberly reported her adjusted gross income in 2017 and 2018 as $6,159 and $7,806, respectively.  She testified that she performed a variety of side jobs, such as helping an elderly woman with daily tasks, holding garage sales, and "scrapping when [her] body

[felt] like it," to make ends meet. She also testified that she had fibromyalgia that required her to have a "sit-down job" and that she sometimes needed help at work if she was "having a bad day." Mark testified that he had been employed by the same company for the past 26 years and expected to remain there indefinitely. He testified that his average annual salary was approximately $60,000.

The superior court issued a divorce decree soon after trial. The court initially held off on addressing any potential post-majority child support for Nathan, questioning whether it retained subject matter jurisdiction decades after Kimberly and Nathan's 1997 move to Ohio. But after the parties filed supplemental briefing on the issue, the court agreed with Kimberly that it had jurisdiction to issue a support order, and it issued an order requiring Mark to reimburse her for Nathan's care.

The court found that Nathan had "significant impairments" that he would have "for life" and that his "mental disability (autism) . . . [made] it impossible for him to fully take care of himself as an adult." The court explained that although Nathan was "capable of earning approx. $12,000/yr working at an [amusement] park," he was "dependent on housing, food, and care, including prompts and coaching, that [were] provided by [Kimberly], to help him get to work, remember his appointments, and take care of the normal activities of daily living."

In a separate decision addressing the allocation of marital debts and assets, the court found that Mark's income was at least $60,000 per year while Kimberly earned approximately $27,000 per year.

The support order required Mark to pay $1,065 per month in child support beginning December 1, 2019. The court found that "this amount reasonably reimburse[d] [Kimberly] for a fair percentage of the funds actually spent on caring for Nathan." In arriving at that amount, the court accepted as evidence a list that Kimberly provided of tracked average monthly expenses for both herself and Nathan over a three-

month period for rent, utilities, phone service, and groceries. Nathan's half of those expenses averaged $1,065. The court also found that

> [t]he evidence at trial indicated Nathan earns about $12,000 annually. What is not clear, however, is the extent to which he contributes any of his earnings toward household expenses. Assuming that he does, [Mark] should receive a reduction of 50% of the amount Nathan contributes. (The [$1,065 monthly support award] assumes zero contribution from Nathan.)

Finally, the court provided that the child support award "may be adjusted every 12 months to take into account Nathan's earnings, his own contributions toward household expenses, and any new services or financial assistance he receives."

Mark appeals.

## III. STANDARD OF REVIEW

"We review jurisdiction issues de novo."[1] "In conducting de novo review, we will 'adopt the rule of law that is most persuasive in light of precedent, reason, and policy.' "[2]

"Findings of fact are reviewed for clear error," and "[w]e will not reverse such determinations unless left with a 'definite and firm conviction that a mistake has been made.' "[3] "[W]hether the trial court applied the correct legal rule . . . is a question

---

[1] *Sherrill v. Sherrill*, 373 P.3d 486, 489 (Alaska 2016).

[2] *Se. Alaska Conservation Council, Inc. v. Dep't of Nat. Res.*, 470 P.3d 129, 136 (Alaska 2020) (quoting *State, Div. of Elections v. Green Party of Alaska*, 118 P.3d 1054, 1059 (Alaska 2005)).

[3] *Grove v. Grove*, 400 P.3d 109, 112 (Alaska 2017) (quoting *Beals v. Beals*, 303 P.3d 453, 459 (Alaska 2013)); *Sanders v. Sanders*, 902 P.2d 310, 315 (Alaska 1995) (quoting *Murphy v. Murphy*, 812 P.2d 960, 964 n.7 (Alaska 1991)).

of law that we review de novo using our independent judgment."[4] "Where a question of law is not involved, however, a superior court has 'broad discretion in making child support determinations'; we review those decisions for abuse of discretion."[5]

## IV. DISCUSSION

### A. The Superior Court Did Not Err By Concluding It Had Jurisdiction To Order Child Support For Nathan.

Under 28 U.S.C. § 1738B(d), "[a] court of a State that has made a child support order . . . has continuing, exclusive jurisdiction over the order if the State is the child's State or the residence of any individual contestant." This principle has its counterpart in Alaska law:

> A tribunal of [Alaska] that has issued a child support order consistent with the law of this state has and shall exercise continuing, exclusive jurisdiction to modify its child support order if the order is the controlling order and, . . . at the time of the filing of a request for modification, this state is the residence of the obligor, the individual obligee, or the child for whose benefit the support order is issued.[6]

Mark argues that Alaska lost jurisdiction to order child support when Nathan turned 19 and the original child support order issued by CSSD expired by its terms. He also argues that the superior court lacked jurisdiction over Nathan because Alaska is not Nathan's home state.[7]

---

[4]     *Grove*, 400 P.3d at 112 (a second alteration in the original) (quoting *Beals*, 303 P.3d at 459).

[5]     *Sherrill*, 373 P.3d at 490 (quoting *Wells v. Barile*, 358 P.3d 583, 588 (Alaska 2015)).

[6]     AS 25.25.205(a).

[7]     Mark claims that the superior court "lost personal and subject matter
(continued...)

We hold that the superior court had continuing, exclusive jurisdiction to modify the support order despite the fact it had lapsed. The statutory requirements for continuing, exclusive jurisdiction are met. CSSD is an Alaskan "tribunal"; its original order was issued pursuant to Alaska law; and the superior court has the authority to modify a CSSD child support order.[8] No other support orders had superceded the CSSD order. And Mark — "the obligor" — continued to live in Alaska following the separation and was a resident of Alaska at the time Kimberly asked that the order be modified.

We also hold that Kimberly's request for post-majority support is correctly characterized as a modification of the original child support order, rejecting the argument that an "expired order" cannot be modified.[9] Federal law defines a "modification" in the context of child support orders as "a change . . . that affects the amount, scope, or duration of the order and modifies, replaces, supersedes, or otherwise is made subsequent

---

[7]    (...continued)
jurisdiction over Nathan." Personal jurisdiction is not at issue in this case; Nathan is not a party. And even if he were, Mark — who brought the divorce action — likely could not successfully assert a personal jurisdiction defense to his former wife's support counterclaim. *See Vanvelzor v. Vanvelzor*, 219 P.3d 184, 188-89 (Alaska 2009) (suggesting that if party were not pro se, her failure to challenge court's personal jurisdiction over her would waive defense); *Sherrill*, 373 P.3d at 491 (concluding that court could exercise personal jurisdiction over father because he had "filed responsive pleadings without challenging the court's authority").

[8]    *Berry v. Coulman*, 440 P.3d 264, 272 (Alaska 2019).

[9]    *See Spencer v. Spencer*, 882 N.E.2d 886, 889-90 (N.Y. 2008) (holding New York could not modify expired order from Connecticut because Connecticut maintained exclusive jurisdiction due to father's continued residence there).

to the child support order."[10]  Kimberly requested a change subsequent to the original child support order that would affect the order's duration.  We agree with the superior court that it had jurisdiction pursuant to AS 25.25.205(a) to entertain Kimberly's request.

**B.  The Superior Court Did Not Err By Concluding It Had Authority To Order Support For Nathan As A Disabled Adult Child.**

We concluded in *Streb v. Streb* that courts in divorce actions "ha[ve] the authority to award continuing support payments for a [disabled] adult child."[11]  We held that "the presumption of emancipation may be overcome by evidence that an adult child is incapable of supporting himself or herself by reason of a physical or mental disability."[12]  We further recognized that courts' statutory authority to issue child support orders is not limited to claims involving minor children.[13]

Mark argues, however, that the superior court lacked the statutory authority to modify orders to require post-majority support for adult children years after they have already reached majority.  But our holding in *Streb* controls our decision in this case, and Mark offers no compelling reason why we should decline to follow it.

Mark first points to *Dowling v. Dowling*, a case concerning post-majority

---

[10]  28 U.S.C. § 1738B(b)(8).

[11]  774 P.2d 798, 801 (Alaska 1989).

[12]  *Id.* at 800.

[13]  *Id.* at 800 n.4 (comparing AS 25.24.160(a)(1) ("In a judgment in an action for divorce or action declaring a marriage void or at any time after judgment, the court may provide . . . for the payment by either or both parties of an amount of money or goods, in gross or installments that may include cost-of-living adjustments, as may be just and proper for the parties to contribute toward the nurture and education of their children. . . .") with former AS 25.24.140(a)(2) (1989) (providing for an interim child support order stating that such an order may be provided "for the care, custody, and maintenance of the *minor* children" (emphasis added))).

educational support decided five years before *Streb*.[14]  In *Dowling* we determined that the statutory authority for modifying child support orders did not authorize a court to order the payment of post-majority educational support for an able child.[15]  But we explicitly distinguished *Dowling* in *Streb*, concluding that we "did not purport [in *Dowling*] to preclude the superior court from awarding post-majority support for [disabled] children."[16]

Mark next argues that the word "continue" or "continuing" in *Streb* has a limited meaning:  specifically, "to distinguish between cases where a parent files a request for post-majority support for a disabled child *before* the child emancipates, versus *after* the date the child emancipates," as here.  This argument is fundamentally incorrect, because it appears to assume that disabled children who are unable to support themselves nonetheless become emancipated upon reaching the age of majority.  But we held in *Streb* that "the presumption of emancipation may be overcome by evidence that an adult child is incapable of supporting himself or herself by reason of a physical or mental disability."[17]

Furthermore, our holdings in *Streb* and a similar case, *Sanders v. Sanders*,[18] undermine Mark's argument that we should distinguish situations based on when a parent makes the request for post-majority support.  In both *Streb* and *Sanders* the parties

---

[14]    679 P.2d 480 (Alaska 1984) *superseded on other grounds by statute*, AS 25.24.170(a), *as amended by* ch. 117 § 3, SLA 1992, *as recognized in Scully v. Scully*, 987 P.2d 743, 744-45 (Alaska 1999).

[15]    *Id.* at 482-83.

[16]    *Streb*, 774 P.2d at 801.

[17]    *Id.* at 800.

[18]    902 P.2d 310 (Alaska 1995).

separated, the divorce complaint was filed, and a parent requested post-majority support *after* the child had already reached the age of majority.[19] We affirmed awards of post-majority support in both cases.[20]

Lastly, Mark cites to cases from other jurisdictions, including Washington and Tennessee, that he claims support his interpretation of the term "continue" or "continuing." Even assuming that *Streb* does not definitively answer the question of the superior court's authority in this case, the cases Mark relies on do not change our view of the issue. The Washington cases Mark cites discuss post-majority educational support, and most require a party seeking such support to file a motion before the child turns 18.[21] These cases are also governed by a Washington statute providing that "[u]nless otherwise agreed in writing or expressly provided in the [divorce] decree, provisions for the support of a child are terminated by emancipation of the child,"[22] which occurs when the child turns 18.[23] In that context — where a parent's support obligation ends by law once the child reaches the age of majority and nothing prevents the child from becoming emancipated — having a filing "deadline" may be sensible. But as discussed above, a child incapable of self-support due to disability is not necessarily

---

[19]    *Id.* at 313; *Streb*, 774 P.2d at 799-800.

[20]    *Streb*, 774 P.2d at 800-01; *Sanders*, 902 P.2d at 315.

[21]    *See Childers v. Childers*, 575 P.2d 201 (Wash. 1978); *In re Marriage of Kelly*, 934 P.2d 1218 (Wash. App. 1997); *Balch v. Balch*, 880 P.2d 78 (Wash. App. 1994); *In re Moralez*, No. 51490-7-II, 2019 WL 4949486 (Wash. App. Oct. 8, 2019).

[22]    WASH. REV. CODE 26.09.170(3) (2021).

[23]    *Gimlett v. Gimlett*, 629 P.2d 450, 451-52 (Wash. 1981).

emancipated under Alaska law,[24] meaning that a particular birthday is not determinative of the child's status. Mark's reliance on Tennessee law is also unavailing, because the cases he cites, while involving disabled children, rely on statutory language that limits jurisdiction to cases involving minor children;[25] Alaska's statutes are not comparable.

Because none of Mark's arguments persuade us that *Streb* is not controlling here, we affirm the superior court's exercise of authority to issue a post-majority child support order for Nathan.

### C. We Remand For Clarification Of The Requirement That Mark Pay 100% Of Nathan's Living Expenses.

The superior court ordered Mark to pay Kimberly $1,065 a month in post-majority child support, an amount the court found "reasonably reimburses [Kimberly] for a fair percentage of the funds actually spent on caring for Nathan." The number represents 100% of Nathan's monthly living expenses as shown by Kimberly's evidence at trial — an exhibit summarizing her household expenses supported by documents such as a rental agreement and utility statements. The court acknowledged that its calculations "assume[d] zero contribution from Nathan" but explained the impact any such contributions in the future would have on Mark's support obligation:

> The evidence at trial indicated Nathan earns about $12,000

---

[24] *Streb*, 774 P.2d at 800.

[25] *See In re Conservatorship of Jones*, No. M2004-00173-COA-R3-CV, 2004 WL 2973752 (Tenn. App. Dec. 22, 2004); *Shaw v. Shaw*, No. W2010–02369–COA–R3–CV, 2011 WL 4379052 (Tenn. App. Sept. 21, 2011); *Sizemore v. Sizemore*, Nos. E2005-01166-COA-R3-CV & E2006-01456-COA-R3-CV, 2007 WL 2198358 (Tenn. App. Jul. 30, 2007); Tenn. Code Ann. § 36-6-101(a)(1) (West 2021) ("In a suit for annulment, divorce or separate maintenance, where the custody of a *minor* child or *minor* children is a question, the court may . . . decree that suitable support be made by the natural parents or those who stand in the place of the natural parents by adoption." (emphasis added)).

annually. What is not clear, however, is the extent to which he contributes any of his earnings toward household expenses. Assuming that he does, [Mark] should receive a reduction of 50% of the amount Nathan contributes. . . . Thus, for example, if Nathan contributes $500/mo towards his "room and board," [Mark's] support amount would drop by $250 to $815/mo.

Mark challenges the court's order, arguing that 100% is not a "fair percentage" for one parent to bear of Nathan's living expenses. He argues that the court failed to take into account Kimberly's and Nathan's contributions toward Nathan's care, that the amount of his obligation is unreasonable given his own income and cost of living, that Kimberly should be required to "pursu[e] all [other] options for financial support" for Nathan such as Social Security disability benefits, and that it was unfair not to include an end date for his obligations under the order.

Several of these arguments are without merit. We cannot consider Mark's assertions about his cost of living and an income lower than that reflected in his trial testimony, as they depend on evidence outside the record.[26] Mark provides no legal support for his claim that Kimberly is required to seek benefits from other sources such as Social Security. And it was not error to fail to include an end date in the support order; the court specifically provided that the award "may be adjusted every 12 months to take into account Nathan's earnings, his own contributions toward household expenses, and any new services or financial assistance he receives," and our holding in *Streb* suggests that Mark's duty of support will end if Nathan becomes capable of

---

[26]   *See State, Dep't of Nat. Res. v. Transam. Premier Ins. Co.*, 856 P.2d 766, 776 (Alaska 1993) (concluding that post-trial affidavit not considered by trial court "must be struck" and could not be considered on appeal).

supporting himself.[27]

Mark also argues that the superior court's finding that Nathan is a "disabled" adult is clearly erroneous and must be reversed. We conclude, however, that Mark has waived this argument because he failed to raise it in his opening brief.[28] Even if he did not waive the argument, the disability finding is not clearly erroneous.[29]

We must nevertheless remand the support order to the superior court for clarification of its determination that Mark's payment of $1,065 toward Nathan's living expenses — 100% — represents a "fair percentage." While 100% may not be a per se unreasonable share for a parent like Mark with greater resources than his ex-spouse, we note a possible inconsistency in the order that makes us question whether that is what the court really intended.

The court wrote that if Nathan "contributes any of his earnings toward household expenses[,] . . . [Mark] should receive a reduction of 50% of the amount Nathan contributes." We question why Mark's contribution would be reduced by only half when he is paying all of Nathan's expenses. If, for example, Nathan began to contribute $500 a month toward his own living expenses, and Mark's obligation of

---

[27]     *See* 774 P.2d at 800 ("Although most children are emancipated upon attaining majority, the presumption of emancipation may be overcome by evidence that an adult child is incapable of supporting himself or herself by reason of a physical or mental disability . . . . In such a case, we hold that the parent's duty of support continues after the child reaches majority.").

[28]     Alaska R. App. P. 212(c)(3) (providing that a reply brief "may raise no contentions not previously raised in either the appellant's or appellee's briefs"); *Williams v. Baker*, 446 P.3d 336, 340 n.13 (Alaska 2019) (declining to reach issue not raised in appellant's opening brief).

[29]     *See Sanders v. Sanders*, 902 P.2d 310, 315 (Alaska 1995) (holding "conclusions with regard to [an adult child's] abilities and capacity for self-support amount to factual findings, and as such may be reversed only if clearly erroneous").

$1,065 was reduced by only half of Nathan's contribution ($250), then together they would be paying $1,315 — $250 more than Nathan's actual expenses. We do not understand why Mark's contribution would not be reduced by 100% of the amount Nathan contributes to his own living expenses, especially given our recognition that a parent's obligation of continuing support for an adult child only arises on "evidence that [the] adult child is incapable of supporting himself or herself."[30] Ordinarily, thus, we would expect the parent's support obligation to decrease in direct proportion to the child's ability to support himself or herself. We therefore remand this issue to the superior court for reconsideration and, if the numbers remain as they are, for an explanation why any contributions by Nathan to his own living expenses should not reduce Mark's support obligation dollar for dollar.

## V.    CONCLUSION

We AFFIRM the superior court's exercise of jurisdiction and its authority to order post-majority child support. We REMAND the support order for further proceedings consistent with this opinion.

---

[30]    *Streb*, 774 P.2d at 800.

BORGHESAN, Justice, with whom WINFREE, Chief Justice, joins, concurring.

I agree with the court's analysis of the jurisdictional question. I write separately to address only the court's decision to remand for clarification of whether the superior court intended to order Mark to pay 100% of Nathan's living expenses. It seems to me quite likely that the court's order on this point was intentional.

First, the precise percentage of Mark's support obligation was brought to the court's attention on reconsideration; Mark mentioned it several times in his reply on the motion for reconsideration. The superior court then denied reconsideration by order (rather than by allowing the motion to be denied by passage of time).[1] If the superior court read the briefing — and I presume it did — then it seems unlikely that the court inadvertently ordered Mark to pay 100% of Nathan's support.

Second, there is clear justification in the record for requiring Mark to pay 100% of Nathan's support. The superior court found after the divorce trial that Mark earns two to three times as much as Kimberly and that Kimberly has health issues affecting her ability to work, while Mark is in good health. And because Nathan lives with Kimberly full-time, she seemingly contributes 100% of the non-monetary care work necessary to support a dependent adult. In these circumstances, requiring Mark to pay $1,065 per month, representing 100% of the monetary cost of supporting Nathan, appears to me a "fair percentage" of funds actually spent on Nathan's care.[2]

Nevertheless, I agree with the court that remand is necessary to clarify the justification for reducing Mark's support obligation by only 50% of any amount Nathan contributes to his own support. This proviso was not the subject of briefing on

---

[1]    *See* Alaska R. Civ. P. 77(k)(4) (providing that motion for reconsideration not ruled upon within 30 days of filing is deemed denied).

[2]    *Streb v. Streb*, 774 P.2d 798, 801 (Alaska 1989).

-15-                                                                                           **7626**

reconsideration, and the justification for it is less obvious. It is not clear whether this proviso was an error that would give Kimberly an unexpected windfall or was intentionally chosen to account for Kimberly's non-financial contributions to Nathan's support. Therefore I agree that we must remand the matter for the court to explain (or revisit) this aspect of the support order. And because remand on this narrow point is necessary, I see no harm in inviting the superior court to confirm whether its decision to order Mark to pay 100% of Nathan's living expenses was intentional. Therefore I concur in the court's judgment.

CARNEY, Justice, dissenting.

I respectfully disagree that "the superior court had continuing, exclusive jurisdiction to modify the support order despite the fact it had lapsed."[1] In reaching its conclusion the court brushes aside other facts.

Those facts reveal the lack of foundation for the court's holding that "modifying" can mean "resurrecting." Kimberly testified that Mark made every child support payment until Nathan turned 19 and the order expired by its own terms. Kimberly had previously requested and received an extension of the child support order after Nathan turned 18, but she made no attempt to prevent the order from expiring when Nathan turned 19. And it was not until Mark filed this divorce action, more than three years after the child support order expired, that Kimberly made any attempt to resurrect it. And, unlike the New York case the court offers as support,[2] there are no other minor siblings involved such that an existing custody order could be expanded to cover Nathan.

In *Streb v. Streb*, we held that the court has authority in a divorce action to award continuing support payments for a disabled adult child.[3] In that case, the parents divorced after their disabled daughter was an adult but continued to live with the mother.[4] Our focus on the award of "*continuing* support payments" is telling: we were concerned that the disabled child not lose the support on which she continued to depend.[5] Here, Kimberly has not received support for Nathan in the years since the support order

---

[1]    Opinion at 7.

[2]    Opinion at 7, n.9.

[3]    774 P.2d 798, 801 (Alaska 1989).

[4]    *Id.* at 799-800.

[5]    *Id.* at 801 (emphasis added).

expired.[6]  Resurrecting the long-expired support order does not maintain the status quo of support that concerned us in *Streb*.  Instead, the court creates a new source of support.

The New York Court of Appeals in *Spencer v. Spencer*[7] likewise did not create a brand new requirement for child support; it merely declined to exercise jurisdiction over a child support order from another state.[8]  The Spencers were "the parents of three children."[9]  The divorce court ordered the father "to pay child support of $250 weekly per minor child."[10]  After the eldest child turned 18, the father's support obligation automatically terminated.[11]  The next year, the mother, who had moved to New York following the divorce, sought support payments for the eldest child because he was attending college.[12]  The father opposed, arguing that New York courts lacked subject matter jurisdiction.[13]  A New York court granted the mother's motion, requiring the father to pay (increased) support for the eldest child, in addition to the ongoing support obligations for the younger children.  The Court of Appeals reversed, finding

---

[6]     And Nathan has demonstrated a limited ability to earn income that could be used toward his support.  Opinion at 3.

[7]     882 N.E. 2d 886 (N.Y. 2008).

[8]     *See id.* at 890-91.

[9]     *Id.* at 888.

[10]     *Id.*

[11]     *Id.*  The automatic termination was based on Connecticut law, where the family resided when the parents divorced.  *See id.* (citing Conn. Gen. Stat. § 46b-215 (a)(1).  The determinative issue before the New York court was whether Connecticut retained jurisdiction.  *See id.* at 889-90.

[12]     The mother and children had moved from Connecticut, which issued the original child support order.  *Id.* at 888.

[13]     *Id.* at 888.

that New York lacked subject matter jurisdiction and rejecting the lower court's conclusion that a partially expired, but still controlling, order cannot be "modified."[14]

Unlike the present case, there was an existing, ongoing support order in *Spencer* that required the father to pay support for the younger children; an order that was in effect and "controlling" in another state when the mother filed her motion in New York. By requiring the father to also support the eldest while he was in college, the new (and subsequently vacated) order did in fact modify the still controlling order.

Here, however, there was no "controlling"[15] order requiring Mark to support Nathan. It expired years before Mark filed for divorce. Describing its resurrection as merely a modification strains both the bounds of accepted legal fiction and common sense.

Because there was no controlling support order that could be "modified," I respectfully dissent.

---

[14] *Id.* at 890.

[15] AS 25.25.205(a) (granting jurisdiction to modify only "controlling" child support orders). While the "controlling" language is primarily aimed at situations in which there are multiple orders from multiple jurisdictions, *see* AS 25.25.207, Alaska law still requires that those orders be "in effect" to even be considered potentially controlling. *See* AS 25.25.207(g).